(No. 106683.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RALPH HOPKINS, Appellant.

*Opinion filed December 17, 2009.*

Michael J. Pelletier, State Appellate Defender, Patricia Unsinn, Deputy Defender, and Douglas R. Hoff, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Alan J. Spellberg and Clare Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People.

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Thomas, Kilbride, and Garman concurred in the judgment and opinion.

Justice Burke took no part in the decision.

## OPINION

After a consolidated jury trial in the circuit court of Cook County, defendant Ralph Hopkins was convicted of one count of armed robbery (720 ILCS 5/18—2 (West 2000)) and one count of attempted armed robbery (720 ILCS 5/8—4, 18—2 (West 2000)), based, in part, on the inculpatory statements he made to police following his arrest. The court sentenced defendant to concurrent terms of 12 years' imprisonment. On direct appeal, the appellate court found, *inter alia*, that the police had no probable cause to arrest defendant, vacated his convictions and sentences and remanded for an attenuation hearing. *People v. Hopkins*, 363 Ill. App. 3d 971 (2005) (*Hopkins I*).

On remand, the trial court found that the defendant confessed only after being confronted with his codefendant's written statement, and that this evidence was an intervening factor which provided attenuation from the tainted arrest. The court thus reinstated defendant's convictions and sentences. Defendant appealed and the appellate court affirmed, rejecting defendant's claim that the State was required to prove the intervening evidence was "legally obtained" prior to its use as an attenuating factor. 382 Ill. App. 3d 935 (*Hopkins II*). Defendant filed a petition for leave to appeal the *Hopkins II* court's decision, which this court allowed. 210 Ill. 2d R. 315(a). The State, seeking cross-relief in this court, contends that the appellate court in *Hopkins I* erroneously held that probable cause to arrest defendant was lacking, and requests that we affirm the appellate court's judgment in *Hopkins II* on that basis.[1] Because we agree with the State that probable cause to arrest defendant existed, thus negating the need for an attenuation hearing, we affirm the appellate court's judgment below which affirmed the trial court's reinstatement of defendant's convictions and sentences. See *People v. Durr*, 215 Ill. 2d 283, 296 (2005) (this court is in no way constrained by the appellate court's reasoning and may affirm on any basis supported by the record).

## BACKGROUND

Defendant and codefendant Jeffery Sampson were charged with armed robbery under indictment number 01-CR-696 and attempted armed robbery under indictment number 01-CR-707. The charges arose as a result

---

[1]While the State's briefs request that this court reverse the appellate court's judgment in *Hopkins I*, at oral argument they agreed that the appropriate relief would be for this court to affirm the appellate court's judgment below (*Hopkins II*) which affirmed the trial court's reinstatement of defendant's convictions and sentences.

of two separate incidents, the armed robbery of Alphonso Casarrubias at 9:30 p.m. on December 9, 2000 in Evergreen Park, and the attempted armed robbery of Beverly Hajek in Oak Lawn at 10:40 p.m. that same night. Prior to trial, the state moved to consolidate the charges, which the trial court granted. Also prior to trial, defendant filed, *inter alia*, a "Motion to Suppress Evidence Illegally Seized From Defendant," alleging that he was illegally arrested without a warrant or probable cause and that "any and all fruits taken as a result of the Defendant's illegal arrest," including any statements and identifications, should therefore be suppressed.[2]

At the hearing on this motion to suppress, the State presented the testimony of Oak Lawn Police Officer Scott O'Neill. O'Neill testified, *inter alia*, that, on December 9, 2000, at 10:42 p.m., he was on patrol in a marked squad car when he received a radio dispatch of an armed robbery in progress by "two black males in their 20s" in the area of 53rd Court and 89th Place in Oak Lawn. The dispatch also notified O'Neill that a gun was used in the armed robbery and that the offenders were running eastbound. O'Neill described the weather as cold with snow drifts on the ground, and the area of the robbery as residential with "predominantly white" families. When O'Neill approached the location of the armed robbery, he turned, northbound, onto 53rd Court at 91st Street and could see for several blocks down 53rd Court. He saw only one vehicle in the area, parked with its headlights on at Kimball Avenue and 53rd Court, within one block of the reported armed robbery. O'Neill saw no other people or vehicles in the area.

Upon arriving at the intersection of 53rd Court and Kimball, Officer O'Neill stopped and waited for ap-

---

[2]As we have determined that the issue of probable cause to arrest is dispositive of this case, we present only the evidence pertinent to that matter.

proximately 20 seconds while looking inside the lone vehicle. He could see a figure in the vehicle, but could not determine if it was a man or a woman. From the time O'Neill spotted the vehicle, approximately one minute elapsed without the vehicle moving. When Officer O'Neill started to turn right onto Kimball, the vehicle he had been watching began to turn left onto 53rd Court. As both cars were making their turns, O'Neill saw that the driver was leaning back in his seat. When O'Neill and the driver made eye contact, the driver again threw himself back into the seat. O'Neill noticed that the driver of the car was a black male in his 20s. The officer then made a U-turn, called for backup and activated his emergency lights.

After the vehicle stopped, Officer O'Neill approached the driver's side with his weapon drawn. At some point after stopping the vehicle, O'Neill received an additional radio dispatch stating an offender might be driving a red car. O'Neill ordered the driver, whom he identified as defendant, out of the car. As defendant emerged, O'Neill noticed that defendant had snow over his shoes all the way up to the mid-calf of his pants, and that he was breathing heavily. While performing a pat-down search, O'Neill felt defendant's heart beating very rapidly. At that point, O'Neill advised another officer who had arrived that they needed to handcuff defendant. O'Neill testified that defendant was detained at that point, and estimated that he saw defendant's vehicle within two minutes of receiving the radio dispatch.

Defendant testified on his own behalf at the motion hearing. He was 21 years old and, at the time of his arrest, was just passing through Oak Lawn in order to avoid a long train at 87th Street and Southwest Highway after seeing a movie at Ford City Mall. As he was driving, defendant noticed about seven police cars in the area of 53rd and Kimball with their lights on. When he

reached that intersection, he met another officer arriving and stopped to give him the right of way, thinking there was an emergency. The officer also stopped and the two vehicles sat there for approximately one minute, until defendant started to proceed, at which time the officer turned his squad car around and curbed defendant's vehicle. A female officer arrived at about the same time and both she and the first officer drew their weapons on defendant. Defendant was "pulled" out of his car by the first officer who said "Why your heart beating fast?" Defendant testified that he was scared because several officers "put the pistols on me," and this was why his heart was beating rapidly. Defendant was handcuffed and the officer asked him where the other guy was. When defendant asked what the officer was talking about, defendant was thrown to the ground and kicked. Defendant denied that he had snow on his pants when the officer got him out of his car.

Following closing arguments, the trial court took the matter under advisement. Later, in a written order, the court denied defendant's motion to quash arrest and suppress evidence. The court, having had the "opportunity to observe the demeanor of the witness[es] and assess their credibility," and to "resolv[e] the conflict in testimony," made a detailed finding of facts:

"1. That on December 9, 2000 at approximately 10:42 p.m. Oak Lawn Police Officer Scott O'Neill, an eight-year veteran of the police department, was enroute to his police station when he received a dispatch concerning an armed robbery in progress.

2. That the dispatch included the following information:

a. That the area of the armed robbery was 53rd Court at 89th Street.

b. That a gun was used; and

c. That it was perpetrated by two male blacks in their 20s who were running eastbound on foot.

3. That in response to the dispatch Officer O'Neill proceeded to the location described.

4. That the Officer turned off 91st Street onto 53rd Court and observed only one car and no other individuals in the area.

5. That the Officer observed the car on Kimball at 53rd Court.

6. That Kimball is approximately one block away from 89th Street.

7. That the car observed by the Officer was stopped at that intersection with the headlights on for approximately one minute.

8. That the Officer proceeded on 53rd Court toward Kimball and stopped at the intersection of 53rd Court and Kimball.

9. That this area was residential in nature and there were streetlights on each corner of the intersection of 53rd Court an Kimball.

10. That a maximum of two minutes elapsed from the time the Officer received the dispatch until his arrival at the intersection of 53rd Court and Kimball.

11. That the Officer remained stopped for approximately twenty seconds.

12. That thereafter as the Officer began to turn onto Kimball, the car he was observing began to turn left onto 53rd Court.

13. That at this time the Officer was approximately ten feet away from the car and was able to observe the driver of the car and the two made eye contact.

14. That at this point the driver of the car reclined his body in the seat and his arms were fully extended forward.

15. That the Officer observed that the driver of the car was a male black in his early 20s.

16. That the Officer effected a U-turn and began to follow the car.

17. That the Officer called for back up and thereafter stopped the car.

18. That the Officer approached the driver and asked him to exit the car.

19. That once the driver exited the car the Officer observed that the driver had snow on his shoes and on his pants up to his mid-calf area.

20. That the Officer also noticed that the driver was breathing heavily and that his heart was beating at a very rapid pace.

21. That thereafter police handcuffed the driver who is the Defendant in this cause and placed him under arrest.

22. That the weather conditions were such that there was snow on the ground and snow drifts in the area.''

Based upon the foregoing findings of fact, the trial court held:

"Officer O'Neill possessed knowledge of sufficient articulable facts at the time of the stop of the Defendant to create a reasonable suspicion that the Defendant had committed a crime. Further, that once the Defendant exited his car Officer O'Neill became aware of additional facts that together with the facts he already possessed were sufficient to warrant a man of reasonable caution to believe that a crime had been committed and that the Defendant committed that crime."

At a subsequent hearing on defendant's motion to suppress his statement based upon allegations of physical and mental coercion, the State presented, *inter alia*, the following evidence regarding defendant's arrest. Officer O'Neill testified that after defendant complied with a request to place his hands on his vehicle, he intended to place defendant under arrest. O'Neill then told Officer Joe Garrett, who, along with Detective Maguire were on the scene at that time, that they were going to handcuff defendant. At this point, defendant began swearing and yelling about why they had stopped him. He also began to struggle with O'Neill and Garrett, causing all three of them to fall to the ground. The officers quickly regained control of defendant, handcuffed him, and stood him up.

Oak Lawn Police Detective Christine Maguire testified that she also responded to the radio dispatch and, upon arriving at the described location, observed that Officer O'Neill had pulled a red car over to the side of the road. O'Neill was walking toward the red car when she arrived, but had not removed anyone from the car yet.

Both officers drew their weapons and ordered the occupant to exit the car. Officer Garrett arrived after defendant exited the car. Both officers holstered their weapons before O'Neill conducted a pat-down search of defendant for weapons. O'Neill had difficulty handcuffing defendant because he began yelling and trying to pull away from O'Neill. Officers O'Neill and Garrett, along with defendant, fell to the ground while the officers were attempting to handcuff defendant. Approximately ten seconds elapsed before defendant was handcuffed and the officers stood him back up and told him to relax and that they would explain why he was stopped once they were safe. Detective Maguire did not witness any of the officers kicking or striking defendant during his arrest.

Defendant testified consistently with his testimony at the hearing on his first motion to suppress evidence. Following arguments, the trial court denied the motion to suppress, finding, *inter alia*, that defendant's testimony was not believable, while the officers' testimony was believable, and that there was no physical or mental coercion which resulted in the giving of defendant's statements to police.

The parties proceeded to a jury trial wherein the State presented, *inter alia*, the testimony of Officer O'Neill concerning defendant's arrest. O'Neill testified consistently with his testimony during the pretrial motion hearings. In particular, O'Neill summarized the reasons for his decision to pull over defendant's vehicle: (1) defendant's vehicle was stopped for an extended period of time in the area of the offense; (2) the driver, defendant, matched the description of the offenders; and (3) defendant acted suspiciously as O'Neill's squad car approached by leaning forward in his seat, "peeking" at the officer, then flinging himself back into his seat. O'Neill conceded that a person's reaction to having several weapons pointed at them could produce an ac-

celerated heartbeat, and that his pat-down search of defendant yielded no weapons. At the conclusion of the trial, defendant was found guilty of the armed robbery of Casarrubias and the attempt armed robbery of Hajek. The trial court thereafter denied defendant's posttrial motion and sentenced him to concurrent terms of 12 years' imprisonment.

On direct appeal, defendant raised several claims, including that "his inculpatory statement should have been suppressed because the police had neither a reasonable suspicion to stop him nor probable cause to arrest him." *Hopkins I*, 363 Ill. App. 3d at 974. Although the appellate court rejected the remainder of defendant's contentions, it held that defendant was the subject of an illegal arrest. *Hopkins I*, 363 Ill. App. 3d at 982-83. Specifically, the panel found that while the police had a sufficient basis to conduct an investigative stop, no probable cause existed at the time defendant was initially arrested. *Hopkins I*, 363 Ill. App. 3d at 982. The court stated that although "O'Neill's suspicions were heightened when he patted down defendant, felt his racing heart and heavy breathing and saw snow on his pants," those facts "warranted further investigation but did not provide O'Neill with enough information to support a warrantless arrest." *Hopkins I*, 363 Ill. App. 3d at 982.

The panel noted that, despite his illegal arrest, the admission of defendant's confession would be admissible if that evidence was sufficiently attenuated from the illegality. *Hopkins I*, 363 Ill. App. 3d at 983. However, where the court found the record on appeal did not allow it to make an independent determination on attenuation, the court vacated defendant's convictions and sentences and remanded the cause to the trial court with directions to conduct a hearing on whether the inculpatory statement was sufficiently attenuated from the illegal arrest to render it admissible. *Hopkins I*, 363 Ill. App. 3d at

984, 988. On remand, the trial court conducted the required hearing and held that defendant's postarrest confessions were admissible despite his illegal arrest. As per the court's instructions in *Hopkins I*, 363 Ill. App. 3d at 988, the trial court therefore reinstated defendant's convictions and sentences. Defendant appealed, arguing that because his codefendant's statement was illegally obtained, it could not be an attenuating circumstance. 382 Ill. App. 3d at 938. The State, while not contesting this rule of law, contended there was no evidence in the record from which to conclude that codefendant's arrest was illegal. 382 Ill. App. 3d at 938. The appellate court agreed with the State, holding that the State is not required to prove the legality of intervening evidence, and affirming the trial court's reinstatement of defendant's convictions and sentences. 382 Ill. App. 3d at 938, 940. We granted defendant's leave to appeal. 210 Ill. 2d R. 315(a).

## ANALYSIS

As initially noted, we find the issue raised by the State in its request for cross-relief in this court to be dispositive. The State argues to this court that the appellate court in *Hopkins I* erred in holding that probable cause to arrest defendant was lacking, that no attenuation hearing was necessary to determine the admissibility of defendant's inculpatory statements at trial, and that we should therefore affirm his convictions. In response, defendant first claims that this court lacks jurisdiction to even consider the State's request for cross-relief because no petition for leave to appeal was filed following the appellate court's ruling in *Hopkins I*. Defendant next contends that the State "waived" its right to challenge the appellate court's probable cause determination when it failed to file a petition for leave to appeal following the decision in *Hopkins II*. Defendant further asserts that the doctrines of collateral estoppel and law

of the case preclude the State from raising the probable cause issue at this time. Finally, defendant argues that, if the State may raise this issue, the *Hopkins I* court properly determined that police lacked probable cause to arrest defendant. We address each contention in turn.

First, it is clear that this court has jurisdiction over the State's request for cross-relief. Supreme Court Rule 318(b) provides: "The review of cases at an interlocutory stage is not favored, and a failure to seek review when the Appellate Court's disposition of the case is not final does not constitute a waiver of the right to present any issue in the appropriate court thereafter." 155 Ill. 2d R. 318(b). Thus, to the extent defendant is arguing that the State should have filed a petition for leave to appeal from the *Hopkins I* decision based on the possibility that, on remand, the trial court would find that defendant's post-arrest statements were not attenuated from his illegal arrest, we disagree.

Indeed, the *Hopkins I* court had examined the four factors set forth in *Brown v. Illinois*, 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62 (1975), which are used to determine attenuation, and found that the trial court's conclusions supporting attenuation as to three of the four factors "will not be disturbed on review." *Hopkins I*, 363 Ill. App. 3d at 983. As to the fourth factor, whether there were intervening circumstances, while the court found that the record on appeal contained insufficient information to make an "independent determination," it stated that it would address defendant's other claims on appeal, "[b]ecause the trial court on remand may find enough attenuating circumstances to conclude that defendant's statement was admissible." *Hopkins I*, 363 Ill. App. 3d at 984. These findings suggest that the State had a good chance of establishing attenuation on remand and, given the clear dictates of Rule 318(b), therefore had no reason to seek

this court's review of *Hopkins I*. Accordingly, because the appellate court in *Hopkins I* remanded to the trial court for an attenuation hearing, there was no "waiver of the right" to present the State's probable cause claim at a later time. 155 Ill. 2d R. 318(b).

Next, defendant argues that the State waived its right to challenge the appellate court's probable cause determination when it failed to file a petition for leave to appeal following the decision in *Hopkins II*. However, Supreme Court Rule 318(a) specifically provides:

"In all appeals, by whatever method, from the Appellate Court to the Supreme Court, *any appellee*, respondent, or coparty may seek and obtain any relief warranted by the record on appeal without having filed a separate petition for leave to appeal or notice of cross-appeal or separate appeal." (Emphasis added.) 155 Ill. 2d R. 318(a).

Therefore, the State, as appellee in defendant's appeal to this court from the appellate court's decision in *Hopkins II*, had no duty to file its own petition for leave to appeal or cross-appeal, and is not procedurally barred from seeking cross-relief if warranted by the record.

Defendant further asserts that the doctrines of collateral estoppel and law of the case preclude the State from raising the probable cause issue in this court. "[C]ollateral estoppel 'bars relitigation of an issue already decided in a prior case.' " *In re A.W.*, 231 Ill. 2d 92, 99 (2008), quoting *People v. Tenner*, 206 Ill. 2d 381, 396 (2002). The doctrine applies when a party participates in two separate and consecutive cases arising on *different* causes of action and some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former case by a court of competent jurisdiction. *Tenner*, 206 Ill. 2d at 396; *People v. Moore*, 138 Ill. 2d 162, 166 (1990). In *Tenner*, 206 Ill. 2d at 395-96, this court found the doctrine of collateral estoppel applicable "because the instant case involving the defendant's second post-

conviction petition is not the same case as either that involving his first post-conviction petition or that involving his federal *habeas corpus* petition." However, unlike in *Tenner*, the doctrine does not apply to the direct appeal scenario presented here, where there is only *one* cause of action and the issue of probable cause is being addressed at different stages of that single cause of action. See *Tenner*, 206 Ill. 2d at 392 (a postconviction petition is a collateral attack on a prior conviction and sentence, not a surrogate for a direct appeal).

Further, assuming, *arguendo*, that *Hopkins I* and *Hopkins II* could be considered different causes of action, the utilization of collateral estoppel requires, *inter alia*, that there has been a final judgment on the merits in the prior adjudication. *A.W.*, 231 Ill. 2d at 99; *People v. Franklin*, 167 Ill. 2d 1, 12 (1995). This court has repeatedly held that " '[f]or purposes of applying the doctrine of collateral estoppel, finality requires that the potential for appellate review must have been exhausted.' " *A.W.*, 231 Ill. 2d at 100, quoting *Ballweg v. City of Springfield*, 114 Ill. 2d 107, 113 (1986). Therefore, as the appellate process is clearly still proceeding in this case, the finality of the judgment cannot be established and collateral estoppel cannot bar the State from raising the probable cause issue here.

As for the law of the case doctrine, defendant is correct in stating that it generally bars relitigation of an issue previously decided in the same case. *People v. Sutton*, 233 Ill. 2d 89, 100 (2009); *Tenner*, 206 Ill. 2d at 395. Therefore, the determination of a question of law by an appellate court in the first appeal may be binding on that court in a second appeal. *Sutton*, 233 Ill. 2d at 100; *Krautsack v. Anderson*, 223 Ill. 2d 541, 552 (2006). However, in *Sutton*, we made clear that the law of the case doctrine does not have the same effect in this court:

> "[E]ven if the law of the case bars relitigation of the issue in the appellate court, the law of the case doctrine is inap-

plicable to this court in reviewing a decision of the appellate court. *People v. Triplett*, 108 Ill. 2d 463, 488 (1985). *Because this is the first time the case has been before this court, we may review all matters which were properly raised and passed on in the course of the litigation. Triplett*, 108 Ill. 2d at 488." (Emphasis added.) *Sutton*, 233 Ill. 2d at 100.

Indeed, this court has repeatedly found that the law of the case doctrine does not apply to it. For example, in *Relph v. Board of Education of DePue Unit School District No. 103*, 84 Ill. 2d 436, 442 (1981), this court held: "Even if the appellate court were bound by the law of the case it had announced in the first appeals, that limitation would not apply to this court. *** Our review may cover all matters properly raised and passed on in the course of litigation." See also *International Union of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 225 Ill. 2d 456, 482 (2006); *Krautsack*, 223 Ill. 2d at 552; *Garibaldi v. Applebaum*, 194 Ill. 2d 438, 447-48 (2000); *Vendo Co. v. Stoner*, 58 Ill. 2d 289, 306 (1974). In finding the law of the case doctrine inapplicable in this court, the emphasis has been on the fact that it was "the first time the case has been before this court," and not on when the issue was addressed by the appellate court. *Sutton*, 233 Ill. 2d at 100; *International Union of Operating Engineers*, 225 Ill. 2d at 482 ("Although this case has run the gamut of the appellate process in the past 18 years, this is our first opportunity to substantively review the appellate court's finding of actual malice. Accordingly, we are not bound by the law of the case doctrine"). Thus, we find that we may consider whether, in this case, the police had probable cause to arrest defendant, as that issue was "raised and passed on" both in the trial court and in *Hopkins I. Relph*, 84 Ill. 2d at 442.

Having found that the State's claim that probable cause existed is properly before this court, we address the merits of the issue. Specifically, the State contends

that the appellate court in *Hopkins I* failed to consider the totality of the circumstances when it held, contrary to the trial court's finding and consequent denial of defendant's motion to quash arrest and suppress evidence, that probable cause to arrest defendant was lacking. In reviewing a ruling on a motion to quash arrest and suppress evidence, this court applies a two-part standard of review. *People v. Wear*, 229 Ill. 2d 545, 561 (2008); *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). "While we accord great deference to the trial court's factual findings, and will reverse those findings only if they are against the manifest weight of the evidence, we review *de novo* the court's ultimate ruling on a motion to suppress involving probable cause." *People v. Jackson*, 232 Ill. 2d 246, 274 (2009); *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001), citing *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996).

Courts have divided police-citizen encounters into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, or *"Terry* stops," which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) encounters that involve no coercion or detention, known as consensual encounters. *Luedemann*, 222 Ill. 2d at 544. In the case at bar, the record shows that both the trial court and the appellate court in *Hopkins I* held that Officer O'Neill's initial *Terry* stop of defendant was valid. Indeed, in this court, defendant appears to accept this finding in *Hopkins I*, and replies only to the State's challenge to the finding that probable cause to arrest was lacking. Thus, we examine the facts supporting the *Terry* stop solely as they relate to a determination of whether probable cause to arrest existed.

In *Jackson*, we recently set forth the law defining probable cause:

"An arrest executed without a warrant is valid only if supported by probable cause. *People v. Montgomery*, 112 Ill. 2d 517, 525 (1986). 'Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime.' *People v. Wear*, 229 Ill. 2d 545, 563-64 (2008), citing *People v. Love*, 199 Ill. 2d 269, 279 (2002). In other words, the existence of probable cause depends upon the totality of the circumstances at the time of the arrest. *Wear*, 229 Ill. 2d at 564, citing *Love*, 199 Ill. 2d at 279." *Jackson*, 232 Ill. 2d at 274-75.

Further, as this court stated in *Love*, " 'In dealing with probable cause, *** we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *People v. Love*, 199 Ill. 2d 269, 279 (2002), quoting *Brinegar v. United States*, 338 U.S. 160, 175, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310 (1949); accord *People v. Wright*, 111 Ill. 2d 128, 146 (1985) (probable cause is a practical concept). Therefore, whether probable cause exists is governed by commonsense considerations, and the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt. *People v. Montgomery*, 112 Ill. 2d 517, 525 (1986). " 'Indeed, probable cause does not even demand a showing that the belief that the suspect has committed a crime be more likely true than false.' *Wear*, 229 Ill. 2d at 564, citing *People v. Jones*, 215 Ill. 2d 261, 277 (2005)." *Jackson*, 232 Ill. 2d at 275; see also *People v. Sims*, 192 Ill. 2d 592, 614-15 (2000) (because an arrest not only serves the function of producing persons for prosecution but also serves an investigative function, courts have not ruled that an arrest can occur only when the known facts indicate that it is more probable than not that the suspected individual has committed the crime).

The record in the case at bar reflects that both the trial court and the *Hopkins I* court found that defendant was under arrest, for the purposes of establishing probable cause, at the time he was handcuffed by police. The State argues that probable cause existed at this point, but alternatively argues that defendant's arrest did not occur until after the showup identification of defendant by Hajek. As there is no disagreement that defendant was in custody and not free to leave at the time he was handcuffed, we shall examine the totality of the circumstances known to police at that point to determine if probable cause to arrest existed. See *People v. Campa*, 217 Ill. 2d 243, 253 (2005) ("The term 'physical custody' is defined as '[c]ustody of a person (such as an arrestee) whose freedom is directly controlled and limited.' Black's Law Dictionary 1183 (8th ed. 2004)"); *People v. Ollie*, 333 Ill. App. 3d 971, 981 (2002) (an arrest has taken place when the suspect's freedom of movement is restrained by physical force or a show of authority). In so doing, we cull information from the record of the hearings on defendant's motions to quash and suppress, as well as his trial. See *People v. Stewart*, 104 Ill. 2d 463, 480 (1984) (in reviewing the denial of a motion to suppress, a reviewing court is free to look to trial testimony as well as the evidence presented at the hearing on the motion to suppress).

While patrolling in a marked squad car at 10:42 p.m. on December 9, 2000, Officer O'Neill was dispatched to an armed robbery in progress near 53rd Court and 89th Street. The dispatch described the suspects as "two black males in their 20s" who were armed and headed eastbound on foot. O'Neill drove toward the location given, and when he turned his car from 91st Street onto 53rd Court, he saw one car in the area. The car's headlights were on and it was stopped about two blocks away from O'Neill on Kimball Avenue at 53rd Court. That was the

same block where the reported robbery occurred. O'Neill drove toward Kimball Avenue and stopped at the intersection. He remained stopped for about 20 seconds. The car under observation did not move. O'Neill could see a person in the car but he could not tell whether the person was male or female. As O'Neill began to turn right onto Kimball Avenue, the observed car began to turn left onto 53rd Court. O'Neill was then about 10 feet away from the car at a lighted intersection in a lighted residential neighborhood. O'Neill looked inside the car and made eye contact with the driver. When O'Neill made eye contact, the driver shifted in his seat from a forward position to a leaning-back position with his arms extended. O'Neill could see that the driver was a black male in his early 20s. O'Neill also knew that the population of the neighborhood was predominantly white.

O'Neill called for backup, pulled defendant's car over and approached the driver's side with his gun drawn. He asked the driver to get out of the car. When the driver, defendant, exited the car, O'Neill noticed snow on his pants from mid-calf down. There were snow drifts on the ground that night. When O'Neill performed a pat-down search of defendant, he noticed defendant was breathing heavily and his heart was beating rapidly. Additionally, at some point after stopping defendant's vehicle but prior to his arrest, O'Neill was notified that one of the offenders could be driving a red vehicle. Detective Maguire, who arrived just after O'Neill had curbed defendant's vehicle, described it as a "red car." O'Neill then told another officer who had arrived that they were going to handcuff defendant. O'Neill estimated that the elapsed time between the dispatch and his arrival at 53rd and Kimball was, at most, two minutes.

We find it helpful to review the information Officer O'Neill possessed at the time he initially curbed defendant's vehicle using the "summary" of reasons O'Neill

testified to at trial. First, defendant's vehicle was stopped for an extended period of time in the area of the offense. More specifically, no other people or vehicles were in sight, and this vehicle appeared to be occupied and idling within one block of the crime scene. See *Illinois v. Wardlow*, 528 U.S. 119, 124, 145 L. Ed. 2d 570, 576, 120 S. Ct. 673, 676 (2000) ("officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation"). Second, the driver, defendant, a black male in his 20s, matched the description of the offenders. The record further shows that O'Neill considered the fact that defendant was found in a predominately white neighborhood within two minutes after O'Neill received the radio dispatch of a robbery in progress. These are also "relevant characteristics" warranting further investigation. Third, as O'Neill's squad car approached, defendant acted suspiciously by leaning forward in his seat, "peeking" at the officer, and then flinging himself back into his seat. The Court in *Wardlow* also held that "nervous, evasive behavior" in the presence of a known police officer is suggestive of wrongdoing and is a pertinent factor that police may consider in determining reasonable suspicion. *Wardlow*, 528 U.S. at 124, 145 L. Ed. 2d at 576, 120 S. Ct. at 676. Considering all this information in light of the Court's holdings in *Wardlow*, it is clear that Officer O'Neill possessed sufficient articulable facts at the time of the stop to create a reasonable suspicion that defendant had committed a crime.

The key question, however, is whether the trial court correctly concluded that the additional facts learned by Officer O'Neill after the stop, together with the facts he already possessed, were adequate to rise to the level of probable cause to arrest. Upon defendant complying with the order to exit his vehicle, O'Neill noticed that

defendant had snow up to the mid-calf of his pants and was breathing heavily. Further, upon performing a pat-down search, O'Neill felt defendant's heart beating rapidly. The amount of snow on defendant's pants, his rapid heartbeat and heavy breathing were all consistent with Hajek's report that the offenders had recently fled on foot. Finally, Officer O'Neill testified that, after the *Terry* stop but prior to defendant's arrest, O'Neill received information that one of the offenders was possibly driving a red car, which was the same color as defendant's vehicle.

The difficulty of establishing probable cause is lessened when it is known that a crime has been committed. See *People v. Lippert*, 89 Ill. 2d 171, 179-80 (1982), citing 1 W. LaFave, Search & Seizure §3.2, at 484-85 (1978). The police need less of a factual basis to establish probable cause when they are acting in response to a recent serious crime than when it is not known if a crime has been committed. *People v. Jones*, 374 Ill. App. 3d 566, 575 (2007), citing *Lippert*, 89 Ill. 2d at 180. In cases of serious crime, " 'experience has shown that the chances of apprehending the offender are slight unless he is caught in the vicinity of the crime.' " *Lippert*, 89 Ill. 2d at 180, quoting 1 W. LaFave, Search & Seizure §3.2, at 484-85 (1978).

In *Jones*, 374 Ill. App. 3d at 575, the serious crimes of murder and attempted murder had been committed about 15 minutes before the police apprehended the defendant, who was within three blocks of the crime scene and fit the general description of the fleeing suspects. The *Jones* court found that these circumstances alone supported a finding of probable cause, stating:

> "More facts would have been needed to establish probable cause if the suspect had been physically or temporally more distant from the scene or if the officers did not know for certain that a serious crime had been committed. Not only did the time and place of defendant's apprehension cor-

respond to the time and place of the shooting, but defendant also fit the description given by the witnesses and had been running as reported by the witnesses." *Jones*, 374 Ill. App. 3d at 575.

Here, as in *Jones*, not only did the time and place of defendant's arrest correspond with the time and place of the serious crime of attempted armed robbery, but defendant also fit the general description given by Hajek and appeared to have been running through the snow, as she reported.

As previously stated, whether probable cause exists is governed by commonsense considerations, and the calculation concerns the probability of criminal activity, which does not even demand a showing that the belief that the suspect has committed a crime be more likely true than false. *Jackson*, 232 Ill. 2d at 275. Given this standard, we find that the trial court herein did not err in holding that the facts known to Officer O'Neill at the time of defendant's arrest were sufficient to lead a reasonably cautious person to believe that defendant had committed a crime. See *Wear*, 229 Ill. 2d at 563-64. Therefore, after examining the record to ascertain the totality of the circumstances known to Officer O'Neill at the time defendant was apprehended, we conclude that the police had probable cause to effectuate an arrest.

## CONCLUSION

Because the appellate court in *Hopkins I* found that probable cause to arrest defendant was lacking, that court ordered a remand for an attenuation hearing. The *Hopkins II* court then affirmed the trial court's finding on remand that defendant's statements were sufficiently attenuated from his illegal arrest. However, as we have determined that probable cause to arrest was present prior to the time defendant made his inculpatory statements, there was no need for an attenuation hearing and, accordingly, there is no need for this court to

consider defendant's arguments regarding attenuation. We therefore affirm the appellate court's judgment below which affirmed the trial court's reinstatement of defendant's convictions and sentences.

*Appellate court judgment affirmed.*

JUSTICE BURKE took no part in the consideration or decision of this case.