2020 IL App (1st) 190591-U

FIFTH DIVISION
March 31, 2020

No. 1-19-0591

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 18 CR 323401 |
| | ) | |
| WILLIAM ROBINSON, | ) | Honorable |
| | ) | Domenica Stephenson, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE DELORT delivered the judgment of the court.
Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held:* We affirm the circuit court's decision to grant the defendant's motion to suppress evidence obtained following an investigatory *Terry* stop. We find police officers lacked a reasonable articulable suspicion to conduct the investigatory stop.

¶ 2    Defendant William Robinson was charged with multiple offenses after police officers recovered a firearm from his person. He moved to suppress evidence, arguing that the underlying investigatory stop and search was unreasonable, and that he was subjected to an unlawful arrest without probable cause. The circuit court granted defendant's motion. The State filed a motion to

reconsider, which was denied. The State has filed a certificate of impairment, and appeals. We affirm.

¶ 3                                    BACKGROUND

¶ 4      On February 14, 2018, Chicago police officers on patrol observed defendant walk across a street while clenching his right hand against his waist and upper thigh, with his left hand swinging freely. When defendant saw the officers' squad car approach, he began to walk swiftly towards a parked car and entered the passenger-side door. The officers parked directly next to the vehicle defendant had entered. One of the officers approached the passenger-side door and confronted defendant, who was manipulating his waist area with his hand. After recognizing a bulge in defendant's waistband consistent with a firearm, the officer recovered a handgun. Following his arrest, the State charged defendant with multiple offenses, including armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2016)), unlawful use or possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2016), and aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1) (West 2016)). Defendant filed a pretrial motion to quash arrest and suppress evidence, arguing that the underlying stop and search was unreasonable, and that he was subjected to an unlawful arrest without probable cause. He contended that his conduct before being stopped did not provide the officers with a reasonable, articulable suspicion that he had committed or was about to commit a crime.

¶ 5      At the suppression hearing, Chicago police officer Michael Callahan testified that during the evening of February 14, 2018, he and his partner, Officer Murphy, were on a directed patrol in the vicinity of the 1200 block of South Troy Street. Officer Callahan served on a unit known as the "Area Central Gun Team," which assigned officers to work directed patrols in districts that experienced a spike in crime or a flurry of shootings arising from gang conflicts. A person had

been shot in the same neighborhood at around 5:19 p.m. that day. Officers Callahan and Murphy were directed to patrol the same area to prevent a retaliatory shooting. The officers were not provided with any identifiable characteristics of the individual who committed the earlier shooting. They patrolled the area in an unmarked squad car equipped with municipal police license plates, emergency lights, and sirens.

¶ 6      At around 9:55 p.m., Officer Callahan first saw defendant from a distance of 30 to 35 feet walking southbound in the middle of 1200 South Troy Street. Defendant had nothing in his hands, but, while walking, he clenched his right hand against the waist and upper thigh area of his sweatpants. His left hand swung freely. Officer Callahan demonstrated his observations of defendant to the circuit court.

¶ 7      Officer Callahan stated that he had observed similar conduct previously 30 to 40 times. Based on those observations, he believed that defendant was holding a gun on the side of his pants.

¶ 8      Officer Callahan continued to drive northbound on Troy for another 15 to 20 feet. He observed defendant for an additional five seconds. At that point, defendant saw the squad car, turned, and walked swiftly towards a gold-colored sedan parked on the street. Defendant entered the passenger-side door of the vehicle. Officer Callahan did not activate the lights or sirens in his squad car, nor did he yell, "police," or order defendant to stop. Instead, Officer Callahan parked his squad car directly next to the gold sedan defendant had just entered. No cars were parked in front of or behind defendant's vehicle. Officer Callahan exited his squad car and approached the passenger-side door while Officer Murphy walked to the driver-side door, where another individual, Everett Rice, sat. Both officers wore their badges. At that time, Officers Callahan and Murphy were the only officers present at that location.

¶ 9      When Officer Callahan arrived at the passenger-side door, he saw defendant manipulating his waist area with his right hand. He saw a hard bulge underneath the right waistline of defendant's sweatpants that appeared to be the size and shape of a handgun. Defendant manipulated the same area of his waistband that Officer Callahan previously had observed as defendant walked in the middle of the street moments earlier. Officer Callahan demonstrated to the circuit court how defendant manipulated his hand along his waistband while sitting in the parked car.

¶ 10     Based on these observations, Officer Callahan believed defendant was concealing a handgun and ordered him and Rice to raise their hands and turn off the vehicle. Officer Callahan testified that, at this point, defendant was not free to leave. He drew his service weapon and pointed it at defendant for his own safety and the safety of his partner and Rice.

¶ 11     Instead of raising his hands, defendant attempted to shift the vehicle from park to drive with his left hand. Defendant continued to fidget with the area around his waist using his right hand. Rice, sitting in the driver's seat, complied with the officers' orders and raised his hands.

¶ 12     Officer Callahan directed defendant eight or nine times to raise his hands and defendant did not comply. Rice turned off the engine of his vehicle in compliance with the officers' orders, however, defendant then used his left hand to turn the key to the ignition back on. At that point, additional police officers arrived at the scene. When those officers approached the vehicle, defendant complied with the order to raise his hands.

¶ 13     Chicago police officer Haney was one of the officers who arrived at the scene. He wore a body camera that recorded video the State submitted as evidence during the suppression hearing. The video showed Officer Haney approaching Rice's vehicle with his gun drawn. Officer Callahan is heard on the video saying, "gun," to alert the other officers of the presence of a weapon on defendant's person. Officer Callahan holstered his service weapon, opened the passenger-side

door, and felt the bulge over defendant's waistband. He recognized the bulge as a semiautomatic handgun and reached underneath defendant's waistband to recover the weapon. Officer Callahan then removed defendant from the vehicle and placed him in handcuffs.

¶ 14 Afterwards, Officer Callahan conducted a pat-down search of defendant. Neither an arrest warrant nor an investigative alert had been issued for defendant. Officer Callahan asked defendant if he had a firearm owner's identification card to carry a concealed weapon. Defendant responded that he did not. Officer Callahan placed defendant under arrest.

¶ 15 Following the parties' arguments on defendant's motion, the circuit court issued its ruling. The court first found that the encounter between defendant and the officers was not consensual. The court ruled that the officers had a reasonable, articulable suspicion to conduct an investigatory stop of defendant. The court, however, concluded that the officers did not have probable cause until after they had recovered the handgun.

¶ 16 The circuit court further explained:

"The officers were acting on a hunch. It was a very reasonable hunch, but it doesn't elevate to probable cause. It's a search when the officer reaches in and grabs the gun. That's clearly a search. The defendant was not free to leave. * * * [T]he seizure of the gun was without probable cause. And they also didn't know if the defendant had a concealed carry at that point. So based upon all of that, your motion to quash arrest and suppress evidence is granted."

¶ 17 The State filed a motion to reconsider. After hearing argument on the motion, the circuit court clarified its initial ruling, finding "although I said there was a reasonable articulable suspicion for an investigatory stop, in looking at it more carefully, it appears that this was really nothing more than a hunch. When the officers saw the defendant walking down the street holding his pants,

it was a hunch that he had a gun, but [they weren't] certain." Further, the court found that once the officers parked next to Rice's vehicle and approached, the officers conducted an illegal seizure of defendant. The court reiterated that the officers did not have probable cause until recovering the handgun from defendant. The court denied the State's motion to reconsider. The State filed a certificate of impairment and appealed.

¶ 18                                                    ANALYSIS

¶ 19      The State argues that the investigatory stop of defendant was justified. The State contends that several specific articulable facts warranted the investigatory stop, including: (1) the location of the investigatory stop in a high crime area, where a person had been shot hours earlier one block away; (2) defendant's clenching of his arm against his sweatpants in a manner consistent with concealing a handgun; and (3) defendant's evasive behavior. The State also argues that the limited search for weapons was justified because the officers had reason to believe defendant was armed and dangerous.

¶ 20                                             Standard of Review

¶ 21      A reviewing court applies a two-part standard of review to a trial court's ruling on a motion to quash arrest and suppress evidence. *People v. Hopkins*, 235 Ill. 2d 453, 471 (2009). We defer to a circuit court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. *Id.* However, a reviewing court is free to undertake its own assessment of the facts in relation to the issues presented and draw its own conclusions in deciding what relief, if any, should be granted. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). We review *de novo* the circuit court's ultimate legal ruling on a motion to suppress. *Id.*

¶ 22                                        *Terry* Stop

¶ 23    The United States and Illinois Constitutions guarantee citizens the right against unreasonable searches and seizures. U.S. Const. amends. IV, XIV; Ill. Const. 1970, art. I, § 6. "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause." *People v. Sanders*, 2013 IL App (1st) 102696, ¶ 12. However, our supreme court has recognized three types of police-citizen encounters that do not constitute an unreasonable seizure: (1) arrests, which must be supported by probable cause; (2) a brief investigative stop, also known as a "*Terry* stop" under *Terry v. Ohio*, 392 U.S. 1 (1968); and (3) encounters that do not involve coercion or detention and therefore do not implicate fourth amendment interests. *Luedemann*, 222 Ill. 2d at 544.

¶ 24    In *Terry*, the United States Supreme Court held that "an officer may, within the parameters of the fourth amendment, conduct a brief, investigatory stop of a citizen when the officer has a reasonable, articulable suspicion of criminal activity, and such suspicion amounts to more than a mere 'hunch.' " *People v. Gherna*, 203 Ill. 2d 165, 177 (2003) (quoting *Terry*, 392 U.S. at 27). During a *Terry* stop, an officer may temporarily detain an individual for questioning where the officer reasonably believes the individual has committed, or is about to commit, a crime. *Terry*, 392 U.S. at 21-22.

¶ 25    To justify a *Terry* stop, officers must be able to point to specific and articulable facts which, considered with the rational inferences from those facts, make the intrusion reasonable. *Sanders*, 2013 IL App (1st) 102696, ¶ 14; *People v. Rhinehart*, 2011 IL App (1st) 100683, ¶ 14. Although reasonable suspicion is a less stringent standard than probable cause, an officer's hunch or unparticularized suspicion is insufficient. *People v. Lampitok*, 207 Ill. 2d 231, 255 (2003). When determining whether an investigatory stop is reasonable, we rely on an objective standard and view

the facts from the perspective of a reasonable officer at the time of the stop. *Sanders*, 2013 IL App (1st) 102696, ¶ 14. Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. See *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). While an individual's mere presence in a "high crime area" is insufficient by itself to support a reasonable, particularized suspicion that the person is committing a crime, the United States Supreme Court has held that "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Id.* at 124 (citing *Adams v. Williams*, 407 U.S. 143, 144, 147-148 (1972)). A decision to make a *Terry* stop is a practical one based on the totality of the circumstances. *Sanders*, 2013 IL App (1st) 102696, ¶ 14.

¶ 26     The State argues that, in this case, the totality of the circumstances warranted the investigatory stop. In support of their argument, they cite two recent decisions from this court, *People v. Salgado*, 2019 IL App (1st) 171377 and *People v. Johnson*, 2019 IL App (1st) 161104.

¶ 27     In *Salgado*, police officers were directed to patrol a neighborhood due to retaliatory shootings between rival gangs that had occurred in the area. The officers made eye contact with the defendant, who had been walking with another man on a sidewalk. Defendant and the other man immediately separated and walked in different directions. The defendant was adjusting and grabbing at his waistband. Chicago police sergeant Ricky Rivera testified at the suppression hearing that he clearly saw a visible bulge protruding from the defendant's waistband. The officers drove past the defendant and stopped their vehicle. Sergeant Rivera, with his body camera recording, exited and approached the defendant, who continued to grasp at his waistband. When he reached the defendant, he asked him whether he had any weapons in his possession. The defendant responded "no," and continued to walk past him. Sergeant Rivera asked the defendant to lift up his t-shirt so he could "see." The defendant responded, "I don't have to" and

simultaneously grabbed the object in his waistband. Sergeant Rivera immediately placed his hand on the object, which was covered by the defendant's shirt. He recovered a loaded handgun that had its serial numbers removed. Defendant was placed under arrest. *Salgado*, 2019 IL App (1st) 171377, ¶ 5.

¶ 28    The defendant filed a motion to quash and supress the evidence of the investigatory stop. The circuit court denied the defendant's motion and he appealed, arguing that he was seized for the purposes of the fourth amendment immediately upon the officers' arrival, when Sergeant Rivera exited a still moving vehicle to approach him. *Salgado*, 2019 IL App (1st) 171377, ¶ 11, 18.

¶ 29    The *Salgado* court found that the manifest weight of the evidence supported the officers' investigatory stop of the defendant. *Salgado*, 2019 IL App (1st) 171377, ¶ 32. The investigatory stop occurred in a high crime area and the officers conducted a directed patrol to prevent retaliatory gang shootings. However, the court noted that the defendant's mere presence in that area did not, standing alone, justify a *Terry* stop. The court also pointed to the defendant's conduct upon making eye contact with Sergeant Rivera. In particular, the body camera footage revealed that the defendant was nervous, fidgety and he held the inside of his left arm close to the item and in a manner that could support the reasonable inference that he was attempting to shield it from view. Sergeant Rivera believed, at this point, that the defendant was in possession of a firearm. The court held that, "in light of the trial court's factual findings and given the totality of the circumstances, defendant's presence in a high crime area where retaliatory gunfire had been exchanged between rival gangs, his actions upon seeing the police and more importantly, defendant's unusual conduct-based fixation with an item in his waistband, together gave rise to a reasonable suspicion that criminal activity was afoot such that Sergeant Rivera's actions were justified." *Id*.

¶ 30    In *Johnson*, police officers in an unmarked vehicle patrolled in "an area known for high narcotic and gang activity." 2019 IL App (1st) 161104, ¶ 3. One of the officers observed the defendant standing in the middle of an alley. The defendant turned toward the officers, saw them, and then "grabbed onto the front of his waistband and continued walking briskly eastbound as if to avoid" them. *Id*. An officer testified at the suppression hearing that this gesture is common "for people who are trying to hold onto and conceal a weapon." *Id*. As the officers chased the defendant, he held onto his waistband to secure an object and jumped onto the hood of one of the squad cars in pursuit. At that point, the officers patted down the defendant and found a loaded semiautomatic handgun. The defendant argued that the officers did not have a sufficient basis to subject him to a *Terry* stop and pat down since "all he was doing was standing in an alley and touching his waistband." *Id*. ¶ 6.

¶ 31    The circuit court recognized that the defendant had a right to be in the alley, but he was in a high crime area and motioned towards his waistband, which the officers believed indicated that he was armed. The court found that the defendant was not detained until after he ran and jumped onto the hood of the squad car, at which point the officers had an articulable suspicion to detain him and pat him down. *Id*. ¶ 8.

¶ 32    The *Johnson* court considered the defendant's late-night presence in a high-crime area, his retreat upon seeing the officers, and his conduct in holding his waistband and ultimately jumping onto the hood of the police vehicle, all of which gave rise to a reasonable articulable suspicion of criminal activity. *Id*. ¶ 16. In particular, the defendant's leap onto the hood of the squad car "was, to say the least, an unusual act, which suggested aggression and potential danger to the officers or others, regardless of the neighborhood in which it occurred." *Id*. The court found that this conduct,

along with the other evidence, supported a finding of a reasonable suspicion that the defendant was committing, or was about to commit, a crime, thereby justifying the *Terry* stop. *Id*.

¶ 33    Initially, we find that, unlike *Salgado* and *Johnson*, the State failed to present evidence demonstrating that the location where the police officers conducted the investigatory stop was a high crime area. Indeed, the circuit court made no factual finding as to whether the location of the investigatory stop was considered to be a high crime area. "A conclusory and unsubstantiated statement that a location is a 'high crime area' is insufficient to establish that consideration for purposes of justifying a *Terry* stop." *People v. Harris,* 2011 IL App (1st) 103382, ¶ 14.

¶ 34    In this case, aside from Officer Callahan's testimony that an apparent gang-related shooting occurred only hours before and that he and Officer Murphy were assigned to the area to prevent a retaliatory shooting, the State introduced no evidence, either by way of experience or objective knowledge, concerning the level of crime in the area where defendant was stopped. Accordingly, we reject the State's conclusory and unsupported argument that defendant was stopped in a high crime area.

¶ 35    Officer Callahan testified that his attention was drawn to defendant because his right arm seemed to be clenched against the right side of waist and upper thigh area of his sweatpants, but the left side of his body appeared to be moving normally. Officer Callahan believed that defendant's movements were consistent with concealing a firearm on the side of his pants based on approximately 30 to 40 previous observations of similar conduct.

¶ 36    Here, however, unlike *Salgado*, Officer Callahan did not see any visual bulge in the defendant's clothing prior to making the investigatory stop. Further, defendant did not grab at his waistband like the defendant in *Johnson*.

11

¶ 37    The case of *People v. F.J.,* 315 Ill. App. 3d 1053 (2000), is instructive. There, we held that the police officer lacked reasonable suspicion to conduct an investigatory stop of a juvenile. The State offered as the basis for the stop factors including that "it was night, there had been a 'gang disturbance' nearby, it was a high crime area, and [the respondent] put something in his pocket." *Id.* at 1057. The police officer testified that "he had no idea what the object was." *Id.* at 1058. The officer "did not testify that it looked like a handgun or contraband or anything that would naturally arouse suspicion." *Id.* We concluded that the State failed to provide the "specific and articulable facts from which the officer reasonably inferred that [the respondent] was involved in criminal activity." *Id.*

¶ 38    In this case, Officer Callahan testified only that defendant's right arm was clenched against the waist and upper thigh of his sweatpants. He did not testify that he saw defendant with any object or appear to grasp at any object. Nor did he testify that he believed defendant had any object in his hands, rather, he specifically testified that defendant did not have anything in his hands. Officer Callahan's belief that defendant's unusual movement was indicative of his attempt to conceal a weapon, without more reasonable articulable facts, amounted to nothing more than a hunch.

¶ 39    The State further contends that the totality of circumstances shows defendant's evasive conduct. In *Wardlow,* the respondent had fled upon seeing police patrolling an area known for heavy narcotics trafficking. *Id.* at 121. The *Wardlow* Court noted that it had "recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Id.* at 124. The court additionally noted that: "[h]eadlong flight—wherever it occurs—is the consummate act of evasion." *Id.*

¶ 40    However, the Supreme Court also explained in *Wardlow* that "its holding therein was consistent with an individual's right to go about his business when confronted by a police officer lacking reasonable suspicion or probable cause to detain him, and distinguished flight from merely going about one's business." See *People v. Kipfer,* 356 Ill. App. 3d 132, 140 (2005) ("we cannot conclude that [the police officer's] scant suspicion or hunch about defendant ripened into a reasonable suspicion that defendant was about to burglarize a vehicle, rob or assault someone, simply because defendant continued to walk away while [the officer] sounded his horn and asked defendant to stop").

¶ 41    Although evasive behavior can include actions short of fleeing, defendant in this case saw the officers, turned, and swiftly walked towards a parked vehicle and entered it. It was possible that defendant intended, all along, to turn in a different direction and go about his business. The State presented insufficient evidence demonstrating that defendant attempted to flee.

¶ 42    The totality of the circumstances here—defendant's unnatural movement, his turning to walk in a different direction, and entering Rice's vehicle, was insufficient to create reasonable suspicion in a police officer that defendant had committed, or was about to commit, a crime.

¶ 43    Although the State points to additional actions on the part of defendant, for example, his fidgeting with something in his waist while sitting in Rice's car, these occurred after the stop. Under *Terry,* the reasonableness of police action taken during an investigative detention involves a dual inquiry: (1) whether the officer's action was justified at its inception; and (2) whether the officer's action was reasonably related in scope to the circumstances which justified the interference in the first place. *People v. Moss*, 217 Ill. 2d 511, 527 (2005). "Whether an investigatory stop is valid is a separate question from whether a search for weapons is valid." *People v. Flowers,* 179 Ill. 2d 257, 263 (1997) (citing *People v. Galvin,* 127 Ill. 2d 153, 163

(1989)). Any additional actions taken by defendant *after* the stop are irrelevant to the analysis of whether the initial stop was valid. Since the initial stop was invalid, the subsequent actions of Officer Callahan were not justified. "[A] frisk presupposes the right to make a stop." *F.J.,* 315 Ill. App. 3d at 1059 (citing *Terry,* 392 U.S. at 32 (Harlan, J., concurring)) ("if a policeman has a right * * * to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence").

¶ 44    Since the evidence did not show that the police had specific and articulable facts justifying the *Terry* stop, the protective search performed during that stop also lacked a sound constitutional basis.

¶ 45                                    CONCLUSION

¶ 46    Accordingly, the circuit court's judgment granting defendant's motion to suppress is affirmed.

¶ 47    Affirmed.