FIFTH DIVISION
September 17, 2010

No. 1-08-0455

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 06 CR 20687 |
| | ) | |
| JACOBY ADAMS, | ) | The Honorable |
| | ) | Christopher J. Donnelly, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE TOOMIN delivered the opinion of the court:

In the case at hand, we confront a constitutional challenge to the offense of armed habitual criminal, bottomed on due process and *ex post facto* concerns. Following a jury trial, defendant, Jacoby Adams, was found guilty of armed habitual criminal and sentenced to a term of 30 years' imprisonment. Defendant now appeals contending: (1) the armed habitual criminal statute is facially unconstitutional and violates *ex post facto* principles; (2) the State's amendment of the indictment implicated his speedy trial rights and his counsel was ineffective by not raising the issue; (3) his motion to quash was erroneously denied; (4) a defense expert was improperly prohibited from testifying; and (5) the court's response to a jury question was erroneous. For the reasons that follow, we affirm the judgment of the circuit court.

BACKGROUND

Recognizing that defendant does not challenge the sufficiency of the evidence, our review will be limited to the facts necessary to resolve his claims of error. Defendant was initially charged with the offenses of armed habitual criminal, unlawful use of a weapon by a felon, aggravated unlawful use of a weapon, unlawful possession of a rifle, and aggravated unlawful use of a weapon. The count charging defendant as an armed habitual criminal alleged that his prior predicated conviction was aggravated discharge of a firearm. Although the count identified the correct indictment number for the prior conviction, the offense listed was in error. The prior conviction actually was for armed robbery. Accordingly, the State moved to amend the indictment to correct this allegation, drawing no objection from the defense.

Prior to trial, defendant moved to quash arrest and suppress his identification. According to his argument, the arresting officers lacked probable cause to arrest, which essentially was based on the description of the offender, coupled with defendant's proximity to a rifle found secreted in a nearby bush.

At the hearing on the motion, defendant testified he was in the vicinity of 11th Street in Ford Heights, Illinois, around midnight on July 18, 2006. He was arrested by two uniformed officers. At that time, there were "several individuals" in the area, though he could not name them. Defendant was wearing all black. As he spoke with one of the officers, the other officer found a rifle nearby. Defendant denied ever seeing a rifle at any point that night. According to defendant, the officers "had some type of object they rub [*sic*] between my fingers and hand and stuff." Additionally, the officers recovered a bullet from his pocket.

2

Officer Edward Barksdale of the Cook County sheriff's police department testified that he was on patrol in Ford Heights with a partner on July 18, 2006. Around midnight, they heard a call of possible shots fired near 15th and Ellis in Ford Heights, without any description of an offender. They proceeded to the area and spoke with "a lot of people over there." They then received a second call of an unnamed "male black dressed in all black holding a rifle" near 11th and Lexington. After relocating to that location, Barksdale observed defendant, who fit the description in the radio call, standing on the corner. The officers recognized defendant from previous dealings.

According to the report prepared by the officers, defendant approached them when they first arrived on scene. Barksdale told defendant about the radio call and told defendant he needed to pat him down. As Barksdale did so, his partner walked over to the area where defendant had been standing when they arrived. His partner observed an assault rifle on the ground behind a bush and instructed Barksdale to handcuff defendant. The weapon was recovered approximately 10 feet from where Barksdale stood with defendant and two to three feet from where defendant was first seen. It was beneath a bush inside a fence surrounding an apartment complex, about 15 to 20 feet from the door to the residence. Barksdale did not recall seeing anyone else in the vicinity. Nor did he see defendant drop anything in his presence.

The trial court denied the motion to quash. The trial judge concluded that the evidence of "a gun being found within a couple of feet of a person is sufficient probable cause to arrest someone."

In turn, the State nolle prossed all charges other than armed habitual criminal and unlawful use of a weapon by a felon and the matter proceeded to trial. Kelly Moore testified that she saw defendant on July 18, 2006, walking toward her car with a rifle in the area of 11th Street in Ford Heights. Defendant was wearing black clothing and was carrying "a black shotgun and it was kind of rusty with brown spots on it." Defendant was alone, though there was a crowd of people down the street. As he walked past, defendant pointed the weapon in the direction of the car. Moore and her sister-in-law, as well as the four children in the car, began driving toward the police station to report the incident. As they drove away, Moore heard defendant fire a shot into the air.

Curiously, Moore was unable to identify defendant in open court. However, she was able to identify him from a photograph taken on the night of his arrest. According to Moore, the photograph depicted defendant wearing the clothes she saw on him that night. Additionally, Moore identified the gun she saw defendant carrying that night.

Officer Barksdale's trial testimony mirrored his testimony at the hearing on defendant's motion to quash. Barksdale described how evidence technician Bernard arrived on the scene after about 45 minutes and attempted to conduct a gunshot residue test of defendant's hands while defendant was seated in the back of the squad car. Defendant resisted the technician's efforts and attempted to pull his hands away. Thereafter, defendant was transported to the Ford Heights police station and placed in a cell. As Bernard entered the cell, defendant, whose hands were cuffed behind his back, walked backwards and dipped his hands into a toilet. Bernard pulled him away from the toilet and conducted the gunshot residue test. A subsequent search of

defendant's person yielded a live round in one of his pockets.

Officer Bernard acknowledged that he was assigned to administer a gunshot residue test on defendant's hands. However, he was unable to complete the test on scene as defendant, who was seated in a squad car, refused Bernard access to his hands. He turned around in his seat and sat on his hands. Another attempt was made when defendant was in a cell at the Ford Heights police station. When Bernard and other officers entered the cell, defendant walked over and placed his hands, which were cuffed behind him, in the toilet water. The other officers then restrained defendant so Bernard could conduct the test.

Robert Berk, a trace evidence analyst with the Illinois State Police, testified that the swabs from each of defendant's hands tested positive for gunshot residue. Berk explained that it is possible for trace evidence, including gunshot residue, to be transferred from surface to surface. Insofar as police car seats are concerned, transfer is more likely when the seats are cloth, as opposed to vinyl, which is suggested for use in transport vehicles. Berk ultimately concluded defendant either discharged a firearm, came into contact with an item containing gunshot residue, or "his hands were in the environment when the weapon was discharged."

The State then offered a stipulation that defendant was "previously convicted of a total of two or more times of felonies defined as [forcible] felonies by Illinois Statute." Defendant moved for a directed verdict, which the trial court denied.

A hearing was then conducted outside the presence of the jury concerning the qualification of Larry Hood, defendant's proposed expert witness. Hood had been employed for 23 years by the Illinois State Police, 13 of which were spent in the Division of Forensic Sciences

as a crime scene investigator. His training included the collection and packaging of gunshot residue. He also received gunshot residue analysis training from the American Institute of Technology in Youngstown, North Carolina, which encompassed about 1 week of a 15-week course. Hood conceded he was not involved with gunshot residue analysis "except on a casual basis" when he was with the State Police. He explained that during his retirement he "started collecting information and training [himself] doing testing and working on [his] own in regards to the gunshot residue analysis." According to Hood, he had a small lab where he did "chemical and standard microscope analysis," without the benefit of a scanning electron microscope. Over the course of 15 years, Hood performed at least 35 to 40 experiments of this sort, often at the direction of attorneys. Hood claimed to have penned three papers for presentation at appellate defender continuing education seminars. None of these papers were otherwise published or subjected to peer review. Additionally, he claimed he was previously qualified as an expert in gunshot residue analysis in approximately a half-dozen Illinois counties. Insofar as firearms were concerned, Hood possessed no certifications, but was qualified as an expert approximately 30 to 40 times.

Despite having no degree in any scientific field, Hood considered himself "somewhat of a scientist" based essentially on the fact that he spends "a lot of time in the laboratory." None of the tests he performed were ever submitted for independent verification of their accuracy. Hood also described his use of his microscope in performing his tests. He acknowledged that he sometimes sees things under the microscope that he cannot recognize "because of the morphology of the gunshot residue." Occasionally, an associate will assist him in these

situations and they "sometimes *** get it worked out and sometimes [they] don't." Hood also acknowledged that the equipment used by the State Police is more sophisticated "by a longshot" and can determine what certain particles are, whereas Hood cannot identify any of the individual particles *per se*. Hood did not receive or examine samples in the present case and did not personally look at any of the evidence. Hood was only asked "to analyze the labs with regard to the forensic information from the gunshot residue kit to see if there was anything out of the sort with it." He did so by reviewing the reports prepared by the forensic scientists.

The trial court sought an offer of proof as to what opinions Hood would present. In response, defense counsel stated: "I did mention to this Court that we did not know if we were still going to be calling Mr. Hood and to that extent we have now reviewed what would be necessary." Counsel further explained that his testimony would concern the collection of gunshot residue and areas of possible contamination. In addition:

> "He would also be testifying as to guns that, I guess, the nature of gunshot residue must, like the forensic scientist testified, the transferability of it and how it can be transferred with respect to crime scenes because he would be qualified, we would [be] tendering as an expert in crime scene investigation."

Furthermore, Hood would not testify as to the presence or absence of gunshot residue on the swab and any limitations of the gunshot residue test itself. Essentially, his testimony would concern whether the tests could be trusted.

The trial court noted the deficiencies in Hood's qualifications as he was almost entirely self-taught and lacked certification in the field. In response, defense counsel amended her offer

7

of proof to embrace the transferability of gunshot residue. The trial court concluded that Hood could not offer any scientific opinions or conclusions due to his lack of background and training. However, he could testify to matters concerning the collection of evidence. Defendant chose not to call Hood at trial.

The defense presented an investigator from the public defender's office, but his testimony was stricken. Defendant chose not to testify. Following deliberations, the jury found defendant guilty of being an armed habitual criminal and not guilty of unlawful use of a weapon by a felon. Defendant's motion for a new trial was denied and defendant was sentenced to a term of 30 years' imprisonment for armed habitual criminal. His motion to reconsider sentence was denied. This appeal followed.

## ANALYSIS

### Constitutionality of the armed habitual criminal statute

Defendant complains the Armed Habitual Criminal Statute, section 24-1.7 of the Criminal Code of 1961 (720 ILCS 5/24-1.7 (West 2006)) constitutes a denial of due process where the law effectively criminalizes a defendant's character or propensity to commit crimes based on "habitual" behavior. He argues, alternatively, that his trial should have been bifurcated in order to address the prejudice inherent in the charged offense. According to defendant, section 24-1.7 "is an unreasonable method of accomplishing the desired objective in deterring recidivists from possessing firearms." Moreover, the statute runs afoul of the policies against placing evidence of propensity before a jury. Also, he contends: "Disclosure of the circumstances of a defendant's prior crimes to the trier of fact creates obvious concerns about juror confusion and

prejudice. The nature of the prior offense is usually irrelevant to a current charge."

Because defendant challenges the constitutionality of a statute, our review is *de novo*. *People v. Carpenter*, 228 Ill. 2d 250, 267, 888 N.E.2d 105, 116 (2008). All statutes are presumed to be constitutionally valid and the challenger of their constitutionality bears the burden of establishing invalidity. *Carpenter*, 228 Ill. 2d at 267, 888 N.E.2d at 116. Legislation that does not impact fundamental constitutional rights is evaluated to determine compliance with substantive due process by utilizing the rational basis test. *Carpenter*, 228 Ill. 2d at 267, 888 N.E.2d at 116. "When a statute bears a reasonable relationship to a public interest to be served, and the means adopted are a reasonable method of accomplishing the desired objective, it will be upheld." *People v. Adams*, 144 Ill. 2d 381, 390, 581 N.E.2d 637, 642 (1991). It is necessary, then, to ascertain the purpose of the statute, considering the language used as a guide to the intent. *Carpenter*, 228 Ill. 2d at 268, 888 N.E.2d at 116.

Analytical hindsight suggests that the language of section 24-1.7 demonstrates an unmistakable purpose to criminalize recidivist offenders who subsequently receive, possess, sell, or transfer firearms. See 720 ILCS 5/24-1.7 (West 2006). Moreover, the statute evinces a clear intent that the crime apply to those offenders whose prior offenses were of a particular serious class or nature. Unquestionably, there is a public interest to be served in deterring felons from possessing, receiving, or transferring firearms. The legislature could further discern an equal public interest in punishing those who commit the enumerated acts having already been convicted two or more times before for serious, forcible, weapon-related, and high-level narcotics offenses. The danger to society illustrated by their original convictions is only brought

into starker relief by further misconduct involving firearms. Consequently, the purpose of deterrence and punishment of recidivist offenders is effectively and reasonably achieved by this statute.

Additionally, it is clear the offense the State must prove, first and foremost, is the present offense. Therefore, the statute does not, contrary to defendant's contention, punish propensity by proof of propensity. Rather, the armed habitual criminal statute requires proof of present conduct before any prior convictions or behavior becomes relevant, or vice-versa. Each is an element of the offense itself. The State must prove the prior convictions and the present conduct beyond a reasonable doubt. Accordingly, the proof of the necessary elements is not so much about propensity as it is about reality. Consequently, we find defendant has not demonstrated the unconstitutionality of the armed habitual criminal statute.

Defendant further contends the taint of the statute could be eliminated by conducting a bifurcated proceeding. The State points out that such a procedure is not consistent with supreme court precedent in our state. See *People ex rel. Carey v. Pincham*, 76 Ill. 2d 478, 479-80, 394 N.E.2d 1043, 1044 (1979). Essentially, defendant's argument is supported by reference to statutes and case laws addressing sentencing factors. We find these references are inapposite. For example, defendant points to section 111-3(c-5) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3(c-5) (West 2006)) as support for his argument that, "Following *Apprendi*, the Illinois legislature enacted provisions allowing for bifurcation." Section 111-3(c-5) provides, in part:

"Notwithstanding any other provision of law, in all cases in which the

imposition of the death penalty is not a possibility, if an alleged fact (other than

the fact of a prior conviction) *is not an element of an offense* but is sought to be

used to increase the range of penalties for the offense beyond the statutory

maximum that could otherwise be imposed for the offense, the alleged fact must

be included in the charging instrument or otherwise provided to the defendant

through a written notification before trial, submitted to a trier of fact as an

aggravating factor, and proved beyond a reasonable doubt."  (Emphasis added.)

725 ILCS 5/111-3(c-5) (West 2006).

The emphasized phrase in the foregoing section clearly undermines defendant's argument.  The

legislature chose to make the prior convictions elements of the offense, subject to proof beyond a

reasonable doubt.  Consequently, bifurcation is not appropriate under this statutory scheme.

*Ex post facto* Considerations as to Section 24-1.7

Defendant likewise challenges section 24-1.7 as an *ex post facto* law.  He bases this

argument on the fact the armed habitual criminal statute did not exist when he committed the

offenses resulting in his prior convictions.  As this claim also implicates the constitutionality of a

statute, our review is *de novo*.  *Carpenter*, 228 Ill. 2d at 267, 888 N.E.2d at 116.

*Ex post facto* laws are those that (1) criminalize and punish an act innocent when done;

(2) aggravate or make a crime greater than it was when committed; (3) increase the punishment

for a crime and apply such increases to crimes committed before the enactment of the law; or (4)

alter the rules of evidence to require less or different evidence than required when the crime was

committed.  *People v. Leonard*, 391 Ill. App. 3d 926, 931, 911 N.E.2d 403, 408 (2009), citing

1-08-0455

*People v. Morgan*, 377 Ill. App. 3d 821, 823, 881 N.E.2d 507, 508-09 (2007). Challenges to recidivist statutes as violative of *ex post facto* principles generally have not succeeded because courts have found these statutes punish "new and separate" crimes and do not punish defendants for crimes commitment prior to the enactment of the statutes. *Leonard*, 391 Ill. App. 3d at 931, 911 N.E.2d at 409, citing *People v. McCrimmon*, 150 Ill. App. 3d 112, 116-17, 501 N.E.2d 334, 337 (1986). This rationale is guided by the fact that the prior convictions serve only as an element of the charged offense. *Leonard*, 391 Ill. App. 3d at 931, 911 N.E.2d at 409, citing *McCrimmon*, 150 Ill. App. 3d at 116-17, 501 N.E.2d at 337.

Following in the footsteps of *Leonard*, an identical result obtained in *People v. Bailey*, 396 Ill. App. 3d 459, 464, 919 N.E.2d 460, 464 (2009). We see no need, nor has defendant offered any, to depart from these prior holdings. Therefore, defendant's claim that the armed habitual criminal statute violates the prohibition against *ex post facto* enactments is without merit.

Amendment of the Indictment

Defendant claims that correction of the predicate offense in the indictment was a substantive amendment. Defendant maintains that because the amendment occurred more than 120 days after he was arrested, his right to a speedy trial was denied. Moreover, trial counsel's failure to move to dismiss the indictment on speedy trial grounds allegedly deprived defendant of his right to effective assistance of counsel.

In Illinois, the constitutional guarantee of a speedy trial is implemented by section 103-5(a) of our Code of Criminal Procedure of 1963. 725 ILCS 5/103-5(a) (West 2006); *People v.*

12

*Cordell*, 223 Ill. 2d 380, 385-86, 860 N.E.2d 323, 327-28 (2006). Generally, the statute provides that custodial defendants enjoy the right to be tried within 120 days from the time of their arrest. Pretrial delays occasioned, *inter alia*, by the defendant or by agreement of the parties are excluded in computing the speedy trial period. 725 ILCS 5/103-5(a), (f) (West 2006). To commence the running of the statute, the defendant must make a written demand for trial or an oral demand on the record. 725 ILCS 5/103-5(a) (West 2006). However, a defendant who remains in custody after arrest need not make a formal demand. *People v. Mayo*, 198 Ill. 2d 530, 536, 764 N.E.2d 525, 529 (2002). Accused individuals not brought to trial in accordance with these principles are entitled to dismissal of the charges and release from custody. 725 ILCS 5/103-5(d) (West 2006).

In the instant case, defendant maintains the amendment to the indictment was a substantive change, thereby making all prior continuances attributable to the State. In turn, the amended count, occurring more than 120 days after defendant's arrest, implicated his speedy trial rights and the charges should have been dismissed. Clearly, defendant's claim calls upon us to consider the charges contained in each of the predicate indictments. This presents a legal question, which we review *de novo*. *People v. Woodrum*, 223 Ill. 2d 286, 300, 860 N.E.2d 259, 269 (2006).

As a threshold matter, we recognize that the armed habitual criminal statute criminalizes the receipt, sale, possession, or transfer of a firearm by a person with two or more prior convictions, which fall into certain enumerated categories. 720 ILCS 5/24-1.7 (West 2006). To establish the elements of this offense, the State must prove the existence of the prior underlying

convictions. In the case *sub judice*, the original indictment listed two predicate convictions. As noted, in moving to amend the indictment, the prosecutor maintained that the conviction specified on case number 92 CR 1901 erroneously reflected the charge of aggravated discharge of a firearm, rather than the correct offense of armed robbery. The case number did not change. The State asserts that the amendment was proper to correct this formal defect. Defendant stridently disagrees, citing to section 111-5 of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-5 (West 2006)), providing examples of the types of formal defects that can be corrected by an amendment. Thus, defendant posits the amendment sought by the State, albeit without objection, did not fall within the salutary reach of the statute. Furthermore, he contends that because the prior conviction was an element of the offense charged, any change to an element "is always substantive and not formal, the State's change to the indictment in this case was substantive." In support of this contention, defendant relies upon *People v. Patterson*, where our third division observed, "A formal defect is one which does not alter the nature and elements of the offense charged." *People v. Patterson*, 267 Ill. App. 3d 933, 938, 642 N.E.2d 866, 869 (1994).

Defendant's assertion avails us nothing as we perceive that he interprets section 111-5 too narrowly and the holding of *Patterson* too broadly. Section 111-5 lists examples of formal defects which may be amended at any time, including "Any miswriting, misspelling or grammatical error." 725 ILCS 5/111-5 (a) (West 2006). Although the original indictment listed a correct case number, it misnamed the prior conviction. We discern this type of defect properly falls within the rubric of a "miswriting." Elementally, both the originally listed offense and the

actual offense of prior conviction were predicate offenses under the armed habitual criminal statute. Thus, the amendment made no material change to the indictment. Rather, the amendment merely corrected the name of the offense of the prior, underlying conviction. *Patterson* is readily distinguishable, as there the change was clearly substantive, permitting the State to amend the quantity of narcotics the defendant possessed from 15 to 100 grams to 400 to 900 grams. *Patterson*, 267 Ill. App. 3d at 938, 642 N.E.2d at 869. There, the amendment "materially change[d] the indictment" because of the significant role quantity plays in defining the crime as well as setting the punishment in narcotics cases. *Patterson*, 267 Ill. App. 3d at 939, 642 N.E.2d at 870. The same cannot be said of the present charges. Here, the elements of the present offense consist of defendant's possession of a firearm coupled with the fact of a prior conviction for one of certain enumerated offenses. Provided that the prior convictions fall within those categories, the actual offense was essentially surplasage, a matter to which the parties could stipulate, as the parties did in the trial court.

We conclude the amendment in the case *sub judice* was a formal one. Consequently, defendant's speedy trial rights were not implicated, much less compromised. As such, there was no legitimate basis to support a motion to dismiss; therefore, there can be no ineffectiveness. See *People v. Cordell*, 223 Ill. 2d 380, 385, 860 N.E.2d 323, 327 (2006) ("The failure of counsel to argue a speedy-trial violation cannot satisfy either prong of *Strickland* where there is no lawful basis for arguing a speedy-trial violation").

Denial of the Motion to Quash

Our precedent instructs that we apply a two-part standard of review of rulings on motions

15

to quash arrest and suppress evidence. *People v. Hopkins*, 235 Ill. 2d 453, 471, 922 N.E.2d 1042, 1052 (2009), citing *People v. Wear*, 229 Ill. 2d 545, 561, 893 N.E.2d 631, 641 (2008). Factual findings by the trial court are entitled to great deference and will be reversed only where they are against the manifest weight of the evidence. *Hopkins*, 235 Ill. 2d at 471, 922 N.E.2d at 1052 Yet, the ultimate ruling on suppression is a question of law, which we review *de novo*. *People v. Jackson*, 232 Ill. 2d 246, 274, 903 N.E.2d 388, 403 (2009).

As our supreme court summarized in *Jackson*:

"An arrest executed without a warrant is valid only if supported by probable cause. [Citation.] 'Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime.' [Citation.] In other words, the existence of probable cause depends upon the totality of the circumstances at the time of the arrest. [Citation.] *** ' "In dealing with probable cause, *** we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." ' [Citations.] Thus, whether probable cause exists is governed by commonsense considerations, and the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt. [Citation.] 'Indeed, probable cause does not even demand a showing that the belief that the suspect has committed a crime be more likely true than false.' [Citation.]" *Jackson*, 232 Ill. 2d at 274-75, 903 N.E.2d at 403.

1-08-0455

In the proceedings below, it is clear the officers had a lawful basis to approach defendant based upon the radio calls. The evidence at the hearing demonstrated that defendant approached the officers when they arrived in his location. Officer Barksdale described how he advised defendant that the would have to pat him down at the outset of the encounter. Defendant was not handcuffed or otherwise restrained at that point. The situation changed significantly upon Barksdale's partner's discovery of the rifle beneath the bush. At that point, Barksdale was instructed to place defendant in custody. Under the circumstances, probable cause to arrest defendant arose upon the discovery of the rifle in close proximity to where defendant was standing when the officers arrived. At that point, the officers were possessed of sufficient facts to lead them to reasonably believe defendant committed a crime. *Jackson*, 232 Ill. 2d at 274-75, 903 N.E.2d at 403. Consequently, the trial court properly denied defendant's motion.

Exclusion of Testimony of Larry Hood

As noted, at trial defendant called Larry Hood, a private investigator and forensic consultant. According to defendant, he "sought to admit expert testimony regarding the transferability of gunshot residue and that [defendant's] hands could have acquired the gunshot residue from a contaminated environment rather than from handling the rifle." Moreover, defendant contends the absence of this testimony "unfairly bolstered" the State's case. The State counters that defendant failed to make an offer of proof as to the substance of Hood's proposed testimony and, regardless, failed to establish that Hood possessed the requisite degree of expertise to testify in furtherance of defendant's theory of defense. Moreover, the State contends defendant forfeited this issue by failing to make an offer of proof concerning Hood's proposed

17

1-08-0455

testimony. However, it is well settled that forfeiture represents a limitation upon the parties and not courts of review. *People v. Dowding*, 388 Ill. App. 3d 936, 942, 904 N.E.2d 1022, 1028 (2009). Therefore, we will first consider the trial court's ruling.

Prevailing norms of practice teach that decisions concerning whether to admit expert testimony are left to the trial court's exercise of discretion. *Thompson v. Gordon*, 221 Ill. 2d 414, 428, 851 N.E.2d 1231, 1240 (2006). Likewise, we review such rulings using the abuse of discretion standard. *People v. Eyler*, 133 Ill. 2d 173, 211-12, 549 N.E.2d 268, 285 (1989). "An individual will be allowed to testify as an expert if his experience and qualifications afford him knowledge which is not common to laypersons, and where such testimony will aid the trier of fact in reaching its conclusions." *People v. Miller*, 173 Ill. 2d 167, 186, 670 N.E.2d 721, 730 (1996), citing *People v. Novak*, 163 Ill. 2d 93, 104, 643 N.E.2d 762, 768 (1994). The degree of knowledge or expertise is not based upon "an assigned level of academic qualifications." Instead, the question is whether the proposed expert possesses knowledge and experience beyond that of an average citizen. *Novak*, 163 Ill. 2d at 104, 643 N.E.2d at 768. Furthermore, "Regardless of how specialized knowledge is acquired, whether through education, training, experience, or a combination of each, if the witness possesses such knowledge, he or she may testify as an expert." *Novak*, 163 Ill. 2d at 104, 643 N.E.2d at 768, citing *People v. Coleman*, 205 Ill. App. 3d 567, 584, 563 N.E.2d 1010, 1021 (1990).

In the present case, Hood utterly lacked the requisite education, experience or qualifications necessary to be offered as an expert. *Miller*, 173 Ill. 2d at 186, 670 N.E.2d at 730. In a refreshing expression of candor, Hood acknowledged that he was something of a hobbyist

18

when it came to the analysis of gunshot residue beyond matters of basic collection of the evidence. Moreover, he did not exhibit any particular expertise in the area of transferability of gunshot residue over and above that offered by Robrt Berk, who explained the dynamics of transference. Based on the testimony heard at the hearing, we conclude the trial judge did not abuse his discretion by prohibiting Hood from testifying as to any scientific conclusions. The judge clearly understood the objective of the defense in offering this testimony and aptly perceived the shortcomings of Hood's expertise as it related to that objective. It was clear Hood lacked any education or training in the sciences nor did he have sufficient experience to support any such conclusions. Having concluded there was no error in the trial court's ruling, we need not consider the effect of any potential forfeiture of this claim of error.

Trial Court's Response to the Jury's Question

We next consider defendant's claim that the trial judge's response to a jury question "effectively issued a directive to the jury to disregard the glaring weakness in the State's case." During the course of deliberations, the jury directed the following question to the court:

> "Was it determined if the weapon identified as evidence was fired; if so, was it or
> was it not fired?"

In turn, the court responded to the jury, over defendant's objection:

> "Please review the jury instructions regarding what elements must be proved beyond
> a reasonable doubt by the State."

According to defendant, in light of the circumstantial nature of the evidence, this response denied his right to an impartial jury. Furthermore, defendant asserts the trial court "had no authority to

19

answer the jury's question, as [it] demanded the court to give its personal conclusion on a question of fact, regarding matters that were not resolved."  Contrary to defendant's advocacy for *de novo* review, this issue is properly reviewed for an abuse of discretion.  See *People v. Brooks*, 187 Ill. 2d 91, 138, 718 N.E.2d 88, 114 (1999).

Authorities of various stripes generally hold that trial courts are duty-bound to provide instruction to the jury when it has "posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion." *Brooks*, 187 Ill. 2d at 138, 718 N.E.2d at 114.  A trial court, acting in its discretion, may decline to answer a jury question in certain circumstances.  *People v. Averett*, 237 Ill. 2d 1, 24, 927 N.E.2d 1191, 1204 (2010).  In *Averett*, our supreme court further explained that those circumstances include:

> "when the jury instructions are readily understandable and sufficiently explain the relevant law, when additional instructions would serve no useful purpose or may potentially mislead the jury, when the jury's request involves a question of fact, or when giving an answer  would cause the trial court to express an opinion likely directing a verdict one way or the other. [Citations.]" *Averett*, 237 Ill. 2d at 24, 927 N.E.2d at 1204-05.

Importantly, "A circuit court may also refuse to answer an inquiry by a jury if an answer or explanation by the court would cause the court to express an opinion which would probably direct a verdict one way or the other." *People v. Reid*, 136 Ill. 2d 27, 39, 554 N.E.2d 174, 179-80 (1990).  A court is said to abuse its discretion by making a ruling that is "arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the trial court."

1-08-0455

*People v. Lovejoy*, 235 Ill. 2d 97, 125, 919 N.E.2d 843, 858 (2009).

Unquestionably, in the case *sub judice*, the jury's question was addressed to a factual matter. Curiously, the precise factual issue posited in the inquiry was not properly before it. The trial judge's response appears to have been intended to direct the jury's attention back to its charge, as reflected in the law on the charges against defendant. In this sense, the response may not have been the best approach. However, the language used was neutral and emphasized the burden of proof upon the State. It did not refer to any of the evidence presented and did not specify an instruction to revisit. Instead, the response guided the jurors back to the instructions on the law. Arguably, the answer was a comment on the underlying relevance of the question. It is equally arguable that answering as the trial judge did comported with the traditional response, "You have heard the evidence. Please continue deliberating." Had the jury's question been answered in that fashion, it could easily be equated to a "no," as no such evidence was presented. We do not perceive a different result obtains through the court's response because it properly refers to the instruction given to the jury prior to commencing deliberations:

> "It is your duty to determine the facts, and to determine them only from the
> evidence in this case. You are to apply the law to the facts and in this way decide the
> case."

Then, with respect to the substantive offense, the jury was instructed, in part, as follows:

> "A person commits the offense of Armed Habitual Criminal when he, having
> been previously convicted a total of two or more times of a forcible felony as defined
> by the statute of the state of Illinois, possesses a firearm."

21

Although we might not have chosen the response given, we cannot conclude it was "arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the trial court." *Lovejoy*, 235 Ill. 2d at 125, 919 N.E.2d at 858. Therefore, we find no abuse of discretion.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

FITZGERALD SMITH, P.J., with HOWSE, J., concur.