2021 IL App (1st) 181964-U

No. 1-18-1964

Order filed June 11, 2021

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 18252 |
| | ) | |
| GABRIEL WILLIAMS, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE  DELORT delivered the judgment of the court.
Justices Hoffman and Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's convictions for unlawful use or possession of a weapon by a felon, and unlawful use of a weapon, over his contentions that (1) the evidence was insufficient to prove his guilt beyond a reasonable doubt and (2) that the circuit court erred in permitting the State to amend the indictment during the trial to correct the name of the predicate felony conviction to support certain charged counts.

¶ 2                              BACKGROUND

¶ 3    Following a bench trial, defendant Gabriel Williams was convicted of unlawful use or possession of a weapon by a felon (UUWF) (720 ILCS 5/24-1.1(a) (West 2016)) and unlawful use

of a weapon (720 ILCS 5/24-1(a)(6) (West 2016)) and sentenced to concurrent terms of five years and three years' imprisonment, respectively. On appeal, he contends that his conviction should be reversed outright because the State failed to prove his guilt beyond a reasonable doubt. Alternatively, he argues that his right to a speedy trial was violated when the court permitted the State to amend the indictment. For the following reasons, we affirm.

¶ 4    In December 2016, defendant was charged by indictment with five counts of UUWF (720 ILCS 5/24-1.1(a) (West 2016)), based on his possession of a "Tec-9 handgun" (count I), a shotgun (count II), Tec-9 ammunition (count III), shotgun shells (count IV), and "9 millimeter ammunition and shotgun shells" (count V). Counts I through V each alleged that defendant had previously been convicted "of the felony offense of aggravated unlawful use of a weapon in case number 11 CR 7223." Defendant was also charged with four counts (counts VI through IX) of aggravated unlawful use of a weapon (AUUW), and one count (count X) of UUWF based upon possession of a device "used or intended for used in silencing the report of any firearm, to wit: a black flash suppressor."[1] (720 ILCS 24-1(a)(6) (West 2016)).

¶ 5    At trial, Chicago police officer Marcos Hernandez testified that in the early morning hours of November 12, 2016, he and his partner, Officer David Andrew, responded to a report of shots fired and subsequently heard a report of two males running "in a foot pursuit eastbound on 23rd Street from Washtenaw [Avenue]." Hernandez and Andrew exited their vehicle and began to pursue the two men on foot on 23rd Street. Hernandez saw one of the men (later identified as Michael) holding a shotgun. The other man, whom Hernandez identified as defendant, was holding a "Tec 9" firearm in his hand.

---

[1] Counts XI and XII of the same indictment charged defendant's brother, Michael Williams (Michael), with two counts of AUUW. The record reflects that Michael died before defendant's trial.

¶ 6    Hernandez pursued defendant as he turned and ran into a gangway between buildings. Hernandez lost sight of defendant for "two to three minutes." Defendant and Michael ran into the rear entrance of a residence and shut the door as police pursued them. Hernandez described the building as a two-flat. On the second floor, Hernandez encountered the "officers who initiated the foot pursuit." One of the other officers knocked on the door of an apartment on the second floor. An "older" male, later identified as Gabriel Gomez, answered the door, and officers entered the residence. Inside the apartment, Hernandez saw defendant in a bedroom "in a leaning position discarding the weapon" out of an open window. Hernandez testified that he was "able to see the butt of the shotgun as it left [defendant's] hand out the window." When Hernandez approached, defendant "jumped into the bed to attempt to make me believe he was asleep."

¶ 7    Hernandez placed defendant in custody. Police then found Michael, who was attempting to hide on a patio. After defendant was detained, Hernandez went to the bedroom window and "looked out to see exactly where said weapons would have fallen and they were exactly right there under the window." He saw a shotgun and Tec-9, which appeared to be the same weapons that defendant and Michael had been carrying. Hernandez observed as another officer recovered the Tec 9. Hernandez brought the Tec 9-to the police station and inventoried it. Twenty-four live rounds were recovered from the Tec-9. Hernandez additionally testified that, in the same bedroom where he saw defendant, he found a bag containing shotgun shells, 9-millimeter ammunition, and a "flash suppresser slash silencer for the Tec-9."

¶ 8    On cross-examination, Hernandez acknowledged that his squad car was equipped with a dashboard camera that activated when the car's sirens turned on, and that he was wearing a body camera. Hernandez stated that he activated his body camera when the foot pursuit began. He testified that both defendant and Michael were wearing black hoodies and jogging pants. He

recalled that as defendant was running, "his hoodie came off and [Hernandez] was able to see his face." During cross-examination, defense counsel showed Hernandez an arrest report (Defense Exhibit 1), which is not contained in the record on appeal. Hernandez denied that he was the author of the report and testified that its "narrative was typed by my partner." Defense counsel questioned Hernandez as follows with respect to the report:

"Q. And within that report it specifically states that when you went into that bedroom, when you located him, supposedly Mr. Gabriel Williams was hiding, is that correct, or he was found hiding. Is that correct?

A. Mr. Gabriel Williams was in the bedroom.

THE COURT: I want to know what the report says. Is that what the report says?

[DEFENSE COUNSEL]:

Q. Does the report say Mr. Gabriel Williams was found in a bedroom hiding?

A. Yes."

¶ 9     On redirect examination, Hernandez testified that 10 to 15 seconds passed between the time he first saw defendant at the window and when he saw the firearms on the ground. Hernandez was shown the "original case incident report" (People's Exhibit 1) that he had generated. The prosecutor asked: "What does the report say about what you observed Gabriel Williams doing in the bedroom?" Hernandez answered: "It states that I witnessed [him] throwing the weapons out of the window." The court then asked Hernandez: "Weapons plural?" Hernandez answered affirmatively.

¶ 10     Following Hernandez's testimony, the court admitted, over defendant's objection, a certified statement of defendant's conviction for the offense of possession of a firearm by a gang member (720 ILCS 5/24-1.8(a)(1) (West 2010)) in case number 11 CR 0722301. At that point, the State sought leave to amend the indictment based upon a "scrivener's error" with respect to the name of the predicate felony underlying UUWF counts I through V. Although the indictment on those counts accurately stated the case number for the prior predicate felony (11 CR 0722301), those counts incorrectly identified the predicate felony as AUUW, rather than possession of a firearm by a gang member. Defense counsel objected to the amendment, noting that "not only are we at trial but at the end of trial for all of this day. There was no suggestion [of an amendment] made prior to any evidence or waiver of the jury."

¶ 11     The court responded: "I am standing here with my jaw aslack because I want to enunciate it's a scrivener's error and doesn't take the defense by surprise or prejudice." The court reserved ruling until the parties next appeared before the court, October 5, 2017. On that date, the State argued that *People v. Adams*, 404 Ill. App. 3d 405 (2010) was "directly on point" in allowing such an amendment to correct a "formal defect of the indictment."

¶ 12     The court found that *Adams* was "remarkably similar" and indicated that "this type of change is, in fact, a formal defect." The court also noted that the amended predicate felony was "under the precise same case number as that originally noted" in the indictment. The court thus permitted the State to amend counts I through V to "strike aggravated unlawful use of a weapon and add unlawful use of a weapon by a gang member."

¶ 13     The defense called Gabriel Gomez, who testified that he is defendant's father. On the evening of November 12, 2016, Gomez was at his daughter's apartment in the 2600 block of West 23rd Street. Gomez testified that he had arrived at the apartment about 6:00 p.m. and that defendant

was there when he arrived. Defendant was still at the residence when Gomez went to sleep. Later that night, Gomez was awakened by screaming and the sound of police striking the back door to the apartment, which was located in the kitchen. The police demanded that he open the door or they would break it. Gomez saw a woman he knew as "Mary" and her children in the kitchen. When he opened the door, police officers entered the apartment. Gomez heard defendant's voice as police removed him from a bedroom. Gomez testified that defendant was wearing "bed clothes," shorts and a T-shirt. Gomez did not see defendant throw any guns out the bedroom window.

¶ 14     On cross-examination, Gomez acknowledged he had been convicted of a crime but did not remember the name of the offense. During cross-examination, the State played video clips of police bodycam footage (People's Exhibit 3) which was admitted into evidence and is included in the record on appeal, showing several police officers knocking on the door and entering the apartment.[2] Gomez acknowledged that he appeared in the footage, and that he witnessed police remove defendant from a bedroom. He testified that he fell asleep in the apartment between 9 and 10 p.m. and was awakened at approximately 1 a.m.

¶ 15     The defense also called Miriam Alhmedi, who testified that she was a friend of defendant's sister, Adriana Williams. At around 7:00 p.m. on November 12, 2016, Alhmedi arrived at Adriana's apartment. At approximately 1 a.m., Alhmedi was with her three children in the kitchen, when she heard police banging on the back door. Gomez opened the door, and police officers rushed into the apartment. Alhmedi testified that defendant was already in the apartment and sleeping in a bedroom when police arrived. She testified that defendant was in "sleepwear" and

---

[2] It is not apparent from the record which responding officers were the source of the bodycam footage included in People's Exhibit 3, although the State does not dispute that Hernandez's bodycam footage was not introduced at trial.

she denied that he was wearing pants or a hoodie. Police then brought Michael out of another room in the apartment. The police asked Alhmedi if she had seen anybody running into the apartment, and she told them she had not.

¶ 16    On cross-examination, Alhmedi identified herself in police bodycam footage from People's Exhibit 3, which showed defendant being detained. She testified that defendant was wearing shorts, not pants, at the time. To her knowledge, defendant and Michael were already in the apartment when she went to sleep at approximately 11 p.m.

¶ 17    On behalf of defendant, it was stipulated that: (1) if called, a firearms examiner with the Chicago Police Department would testify that he examined the Tec-9 and found that it could be fired using a "small hand tool" and (2) a firearms examiner with the Illinois State Police would state that the Tec-9 was rendered operable and test-fired by Mark Pomerance, a firearm scientist.

¶ 18    Following closing arguments, the court found that it believed Hernandez's testimony that he observed defendant discard a shotgun out of a bedroom window, looked down and saw the shotgun and Tec-9, and that ammunition was also recovered. The court remarked that certain aspects of Gomez and Alhmehdi's testimony were credible and consistent with Hernandez's testimony, but other aspects were not credible. In particular, the court expressed doubt that, while Gomez or Alhmedi were sleeping, they could have known whether defendant and Michael were in the apartment. The court stated it did not believe that defendant and Michael were in the apartment "during the time [Gomez and Alhmedi] were sleeping before the police arrived." The court found defendant guilty of counts I through X.

¶ 19    Defendant filed a motion for a new trial, as well as a "motion to quash arrest and suppress physical evidence." The trial court denied the motions and proceeded to sentencing. Following argument in aggravation and mitigation, the court merged counts II through IX into count I, and

sentenced defendant to five years on count I. The court also imposed a three-year sentence on count X, to run concurrent with count I.

¶ 20    After sentencing, defendant filed an amended motion for new trial, in which he argued that none of the police body camera footage (including People's Exhibit 3 and other footage) showed defendant running with a gun or discarding any weapon out of the bedroom window, rendering Hernandez's testimony incredible. During a hearing on that motion, the court stated that it had reviewed all the video footage. The court remarked that it believed Hernandez was "mistaken" as to whether his body camera was on, stating:

> "Officer Hernandez testifies that he believes that his body cam had been activated in connection with the foot pursuit *** had it been activated, presumably the entry into the bedroom by Officer Hernandez would have been on his body cam and we would have seen at the very least defendant *** being located inside the bedroom and then taken out of the bedroom. I suppose, presumably had the body cam been on, we would have been able to see him lean over and discard a weapon out of the window.
>
> There's no such video that I've been shown, which means I guess there isn't any such video, which means I guess that either Officer Hernandez was lying about his body cam video being on or he's mistaken. I frankly do not see that he's lying. I believe he's mistaken in that regard."

The court denied the amended motion for new trial. This appeal followed.

¶ 21                                    ANALYSIS

¶ 22    On appeal, defendant first contends that his convictions should be reversed because the State failed to prove his guilt beyond a reasonable doubt. "When reviewing a challenge to the

sufficiency of the evidence, this court considers whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). The reviewing court "must allow all reasonable inferences from the record in favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 23    In a bench trial such as this, "it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefore, and to resolve any conflicts in the evidence." *People v. Siguenzo-Brito*, 235 Ill. 2d 213, 228 (2009). This court "will not retry the defendant or substitute its judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony, or the credibility of witnesses. [Citation.]" *People v. Corral*, 2019 IL App (1st) 171501, ¶ 71. We will not reverse a conviction simply because the evidence is contradictory or because "the defendant claims that a witness was not credible." *Siguenzo-Brito*, 235 Ill. 2d at 228. A conviction cannot be set aside "unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt." *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 24    With respect to count I, defendant was convicted under section 24-1.1 of the Criminal Code of 2012, which makes it "unlawful for a person to knowingly possess on or about his person *** any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction." 720 ILCS 5/24-1.1 (a) (West 2016). With respect to count X, defendant was convicted for knowingly possessing a device "designed, used or intended for use in silencing" a firearm. 720 ILCS 5/24-1(a)(6) (West 2016).

¶ 25    In this court, defendant does not specify any particular element of either offense for which he believes proof was lacking. Instead, he generally attacks Hernandez's testimony as incredible

and unsupported by other evidence. He emphasizes that the State's case depended upon Hernandez's testimony, in which he claimed to have seen (1) defendant and Michael running with guns, (2) defendant leaning out window and discarding the shotgun and (3) the shotgun and Tec-9 on the ground beneath the window. Defendant argues that Hernandez's account was "too improbable to be reasonably credited," contradicted, and not corroborated by video evidence. Thus, he urges "no reasonable fact finder" could convict. We disagree.

¶ 26    Viewing the evidence in the light most favorable to the State, the trial court could reasonably credit Hernandez's account and find defendant guilty. Hernandez testified that he responded to a report of shots fired and subsequently heard a report of two men running away from the area. Hernandez pursued the two men on foot and identified defendant as the man holding a Tec-9 firearm in his hand. The other man, whom Hernandez identified as Michael, was holding a shotgun. Hernandez pursued defendant as he turned and ran into a gangway between buildings. Hernandez eventually caught up to defendant inside an apartment, where he saw defendant in a bedroom "in a leaning position discarding the weapon" out of an open window, after which defendant pretended to be asleep in bed. Hernandez explained that he was "able to see the butt of the shotgun as it left [defendant's] hand out the window." When Hernandez looked out of the window, he saw, "exactly right there under the window," a shotgun and Tec-9, which appeared to be the same weapons that defendant and Michael had been carrying. In the same bedroom where he had seen defendant, Hernandez also found a bag containing shotgun shells, 9-millimeter ammunition, and a silencer.

¶ 27    Although Hernandez was the only witness who claimed to have seen defendant with a firearm, it is well-established that the "testimony of a single witness, if positive and credible, is sufficient to convict." *Siguenzo-Brito*, 235 Ill. 2d at 228. Our supreme court has specifically found

that a single eyewitness's testimony may be sufficient to show that a person was armed. See *People v. Wright*, 2017 IL 119561, ¶¶ 76-77 (victim's testimony that codefendant displayed a firearm sufficient to support conviction for armed robbery); *People v. Washington*, 2012 IL 107993, ¶¶ 35-36 (given the victim's "unequivocal testimony and the circumstances under which he was able to view the gun, the jury could have reasonably inferred that defendant possessed a real gun. [Citations.]").

¶ 28    In arguing that Hernandez's account was incredible, defendant points out that his testimony contained inconsistencies regarding when he first saw defendant (3:45 a.m. or 1:00 a.m.) and his distance from defendant when he first saw him running (20 feet or 40 feet). He also points out that Hernandez testified he saw defendant's face while he was running, but Hernandez did not include that fact in a written report. Defendant further asserts that Hernandez's claim to have seen defendant discarding a shotgun out the bedroom window is undermined by his acknowledgement, on cross-examination, that an arrest report (Defense Exhibit 1) indicated that defendant was found "hiding" in the bedroom. Further, to the extent Hernandez testified on redirect examination that the original case incident report (People's Exhibit 1) indicates that defendant threw multiple weapons out the window, defendant urges this presents a "third option for what [defendant] was throwing out the window: one gun, no gun (or anything else), or multiple guns," demonstrating Hernandez had a faulty memory or was not truthful.

¶ 29    These purported inconsistencies did not preclude the court from crediting Hernandez's account and finding defendant guilty beyond a reasonable doubt. Significantly, the weight to be given witness testimony, including findings of credibility, "resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact. [Citations.]" *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006).

"[E]ven contradictory testimony does not necessarily destroy the credibility of a witness." *People v. Gray*, 2017 IL 120958, ¶ 47. "Minor discrepancies in testimony affect only its weight and will not render it unworthy of belief. [Citation]. In addition, where inconsistencies in testimony relate to collateral matters, they need not render the testimony of the witness as to material questions incredible or improbable. [Citation.]" *Id.* "Minor inconsistencies *** within one witness's testimony may affect the weight of the evidence but do not automatically create a reasonable doubt of guilt. [Citation.]"). *Corral*, 2019 IL App (1st) 171501, ¶ 85.

¶ 30    Defendant effectively asks this court to reweigh the evidence to conclude that the purported discrepancies and inconsistencies in Hernandez's testimony rendered it incredible. However, it was the trier of fact's role to decide whether there were inconsistencies and, if so, to weigh them in evaluating Hernandez' credibility. Viewing the evidence in the light most favorable to the State, the court could credit the crux of Hernandez's testimony, despite any inconsistencies.

¶ 31    In particular, the court could conclude that any discrepancies within Hernandez's testimony as to the time and distance from which he first saw defendant were minor and did not detract from the credibility of the core events, including that that he saw defendant discarding a shotgun. To the extent defendant asserts that Hernandez's account was undermined by his testimony acknowledging that Defense Exhibit 1 indicated that defendant was "hiding" in the bedroom, the court could reasonably find that there was, in fact, no inconsistency. Notably, Hernandez testified that, after discarding the weapons, defendant "jumped into the bed to attempt to make me believe he was asleep." As such, the court could still credit Hernandez's eyewitness testimony.

¶ 32    Similarly, the circuit court could have concluded that Hernandez's credibility was not materially affected by the purported distinction between his initial testimony on direct examination that he saw defendant discarding the shotgun from the bedroom window, and his subsequent

testimony acknowledging that the original case incident report (People's Exhibit 1) reflected that he saw defendant "throwing the weapons out of the window." Regardless of whether Hernandez saw defendant drop one or multiple guns, Hernandez testified unequivocally that he located both weapons moments later "exactly right there under the window." The court could and apparently did believe that testimony.

¶ 33    We are also unpersuaded by defendant's suggestion that the State's evidence was insufficient because the State did not introduce video footage from Hernandez's own body camera to corroborate his testimony. Defendant relies on the principle that "the failure of a party to a suit to produce evidence available to him gives rise to a presumption against him." *Tepper v. Campo*, 398 Ill. 496, 505 (1947). He argues that a presumption applies against the State, since Hernandez testified that he activated his body camera but the footage was not introduced. We find this argument unavailing for multiple reasons. First, we note that the trial court's remarks in denying the amended motion for new trial reflect its belief that Hernandez was "mistaken" about whether his body camera was on, but that his account was otherwise credible. In any event, the lack of body camera footage from Hernandez posed no barrier to the trial court finding sufficient evidence to convict. Defendant fails to cite any case applying the principle from *Tepper* in the criminal context, let alone suggesting that a police officer's testimony is insufficient if that officer's body camera footage is not introduced. Indeed, defendant's argument is refuted by the well-settled principle that testimony of a single witness, if positive and credible, is sufficient to convict. *Siguenza-Brito*, 235 Ill. 2d 213, 228; see also *People v. Daheya*, 2013 IL App (1st) 122333, ¶ 76 (if there is credible eyewitness testimony, the State need not present physical evidence to convict).

¶ 34    Furthermore, contrary to defendant's contention, the bodycam footage presented at trial did not "clash" with Hernandez's testimony. Defendant urges that the video shows that Hernandez

stood outside the bedroom door for four seconds before "slowly" entering, and that his actions were "not consistent with an officer seeing an offender trying to dispose of evidence." Defendant similarly suggests that Hernandez's testimony is undermined by his "nonchalant look," and that the footage shows that he "faile[d] to notify other officers of the gun." Defendant essentially asks that we reweigh the video evidence and draw inferences therefrom to find Hernandez' testimony incredible, which we cannot do. *Corral*, 2019 IL App (1st) 171501, ¶ 71. Defendant also points out that the bodycam footage shows that he was wearing a black shirt when he was detained, whereas Hernandez testified that he wore a white t-shirt. Notwithstanding this minor discrepancy, the trial court was still entitled to believe the material aspects of Hernandez's testimony, namely that defendant was in possession of the guns in question. See *Gray*, 2017 IL 120958, ¶ 47.

¶ 35    In sum, viewing the evidence in the light most favorable to the State, the trial court could credit Hernandez's testimony to find that the State proved defendant's guilt beyond a reasonable doubt. Accordingly, we reject defendant's challenge to the sufficiency of the evidence.

¶ 36    We turn to defendant's alternative argument, in which he contends that his right to a speedy trial was violated when the trial court permitted the State to amend the indictment to reflect that the predicate felony for UUWF (counts I through V) was unlawful possession of a firearm by a gang member, rather than AUUW. He argues that the amendment was material rather than formal, such that any prior continuances did not toll the time period in which he was entitled to a trial. He contends that since the amendment was "314 days after his arrest, well past the 160-day time for speedy trial," it violated his right to a speedy trial. See 725 ILCS 5/103-5 (West 2016). On that basis, he seeks outright reversal of his conviction on count I.

¶ 37    Defendant acknowledges that his speedy-trial argument was not included in a posttrial motion and was thus forfeited. See *People v. Sebby*, 2017 IL 119445, ¶ 48 (to preserve a claim for

review, a defendant must object at trial and raise the error in a posttrial motion). Nonetheless, he urges that we may review the issue under the plain-error doctrine, by which this court may "excuse a procedural default *** in two instances: 'when (1) a clear or obvious error occurred and that error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness or the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Staake*, 2017 IL 121755, ¶ 31 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). Regardless of whether an issue was forfeited, "the initial step under either prong of the plain error doctrine is to determine whether the claim presented on review actually amounts to a 'clear or obvious error' at all." *Staake*, 2017 IL 121755, ¶ 33; *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) ("The first step of plain-error review is determining whether any error occurred. [Citation.]"). In this case, we do not find error.

¶ 38    The speedy trial statute, section 103-5 of the Code of Criminal Procedure (Code), provides in relevant part that "[e]very person on bail or recognizance shall be tried *** within 160 days from the date defendant demands trial unless delay is occasioned by the defendant." 725 ILCS 5/103-5(b) (West 2016).[3] If the State makes a material, substantive amendment to an indictment, then the statutory speedy trial period will not be tolled by the amendment. See *People v. Milton*, 309 Ill. App. 3d 863, 866 (1999) ("Substantive amendments should be returned to the grand jury [citation] and the new indictment is then subject to the same speedy trial limitations applicable to the original indictment [citation].").

_____

[3] Section 103-5(a) provides that custodial defendants shall be tried within 120 days from the time taken into custody. The record in this case indicates that defendant was on bail before trial, so section 103-5(b) is applicable.

¶ 39    On the other hand, "[f]ormal amendments [to an indictment] do not implicate speedy trial rights." *People v. Wells*, 2012 IL App (1st) 083660, ¶ 32 (citing *Milton*, 309 Ill. App. 3d at 866). Section 111-5 of the Code provides that an indictment "may be amended on motion by the State's Attorney or defendant at any time because of formal defects," including "[a]ny miswriting, misspelling, or grammatical error." 725 ILCS 5/111-5 (West 2020).

¶ 40    "A defect in a charging instrument is formal in nature where that defect 'is not material or does not alter the nature and elements of the offense charged.' " *People v. Swift*, 2016 IL App (3d) 140604, ¶ 32 (quoting *People v. Flores*, 250 Ill. App. 3d 399, 401 (1993)). "Formal amendment is warranted especially where there is no resulting surprise or prejudice to the defendant or where the record clearly shows that [the defendant] was otherwise aware of the charge against him. [Citation.]" *People v. Ross*, 395 Ill. App. 3d 660, 667 (2009).

¶ 41    Here, the parties dispute whether the amendment to reflect the correct name of the predicate offense in counts I through V was formal or substantive. The threshold question of whether an amendment was formal or material is subject to *de novo* review. See *People v. Adams*, 404 Ill. App. 3d 405, 414 (2010) (explaining that whether amendment was a substantive change "presents a legal question, which we review *de novo*. [Citation.]"). However, a trial court's ruling on the State's motion to amend an indictment is reviewed for an abuse of discretion. *Ross*, 395 Ill. App. 3d at 668. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, or where no reasonable person would take the view adopted by the trial court. [Citation.]" *People v. Patrick*, 233 Ill. 2d 62, 68 (2009).

¶ 42    We find that the amendment to the indictment in this case was formal rather than material, and thus did not affect defendant's right to a speedy trial. In this respect, we agree with the State that is the facts before us are nearly identical to those in *Adams*, 404 Ill. App. 3d 405 (2010). In

*Adams*, the count of the indictment charging defendant as an armed habitual criminal (AHC) erroneously alleged that the predicate conviction for that offense was aggravated discharge of a firearm. *Id.* at 406-07. Although the AHC count identified the correct indictment number for the prior conviction, that conviction "actually was for armed robbery." *Id.* at 407. The State moved to amend the indictment to correct the name of the predicate offense, without defense objection. *Id.* On appeal from his AHC conviction, the *Adams* defendant claimed that correction of the predicate offense was a substantive amendment more than 120 days after his arrest, denying his right to a speedy trial. *Id.* at 413.

¶ 43 In rejecting that argument, this court emphasized that the amendment did not change the case number of the predicate conviction. *Id.* at 414. We also pointed out that "Section 111-5 [of the Code] lists examples of formal defects which may be amended at any time, including 'Any miswriting, misspelling or grammatical error.' " *Id.* at 415 (citing 725 ILCS 5/111-5(a) (West 2006)). We reasoned:

> "Although the original indictment listed a correct case number, it misnamed the prior conviction. We discern this type of defect properly falls within the rubric of a 'miswriting.' Elementally, both the originally listed offense and the actual offense of prior conviction were predicate offenses under the armed habitual criminal statute. Thus, the amendment made no material change to the indictment. Rather, the amendment merely corrected the name of the offense of the prior, underlying conviction." *Adams*, 404 Ill. App. 3d at 415.

As the amendment was formal, "defendant's speedy trial rights were not implicated, much less compromised." *Id.*

¶ 44    In this case, the court concluded that the amendment was merely formal. Here, as in *Adams*, the amendment did not change the case number relating to the predicate offense but merely corrected the name of that prior felony. Therefore, this correction to the name of the predicate offense is properly construed as a "miswriting" within the meaning of section 111-5 of the Code. 725 ILCS 5/111-5(a) (West 2018). Accordingly, we find that defendant's speedy trial rights were not implicated.

¶ 45    Defendant offers several arguments that *Adams* is wrongly decided or distinguishable, but we find those arguments unavailing. Defendant primarily urges that the amendment to the indictment was material because it effectively changed the elements of the UUWF offense, as alleged in counts I through V. He directs our attention to cases finding error where an indictment failed to accurately specify elements of the offense, or where an amendment substantively altered the elements underlying the charges. See *Swift*, 2016 IL App (3d) 140604, ¶¶ 33-34 (indictment's failure to include element of proximate cause in count for aggravated driving under the influence of alcohol was a substantive, rather than a formal, defect); *People v. Kelly*, 299 Ill. App. 3d 222, 227-8 (1998) (trial court erred by allowing State to replace two-count indictment with seven-count information that "altered the essential elements of the crimes for which defendant was indicted"); *People v. Patterson*, 267 Ill. App. 3d 933, 939 (1994) (trial court erred in permitting amendment of indictment to allege intent to deliver a larger amount of cocaine, which "materially change[d] the indictment"). Defendant argues that the amendment in this case was a material, substantive alteration to the UUWF counts, because the predicate felony AUUW conviction originally referenced in the indictment "never happened." He suggests that modifying the name of the predicate felony was "[a]dding an element" to the offense of UUWF, which was material rather than "a mere correction of a scrivener's error."

¶ 46 We reject defendant's suggestion that the amendment in this case purported to add an element to the offense of UUWF, under which it is unlawful for a person "convicted of a felony" to knowingly possess a firearm. 720 ILCS 5/24-1.1(a) (West 2016). The amendment did not introduce a new element, as counts I through V had already alleged that defendant had a prior felony conviction. Rather, the amendment simply corrected the name of the predicate felony, from AUUW to possession of a firearm by a gang member. As mentioned, this change is directly analogous to the amendment in *Adams*, in that it "merely corrected the name of the offense of the prior, underlying conviction" satisfying the predicate offense element. *Adams*, 404 Ill. App. 3d at 415.

¶ 47 Defendant maintains that *Adams* was incorrectly decided because the originally listed conviction named in the indictment "did not exist" and thus cannot be construed as a "miswriting." We disagree. Defendant identifies no precedent suggesting that an error in identifying the predicate offense does not qualify as a "miswriting" within the meaning of section 111-5 of the Code. Moreover, the fact that the case number for the predicate conviction was already correct indicates that the error in the name of the prior offense was an inadvertent "miswriting," a formal defect. 725 ILCS 5/111-5(a) (West 2018). As the trial court noted in this case, the indictment's misidentification of the predicate offense reflected a "scrivener's error."

¶ 48 We are likewise not persuaded by defendant's argument that *Adams* should not control because in that case, defense counsel did not object to the amendment of the indictment, whereas in this case counsel objected to introduction of the certified report of conviction, as well as to the State's amendment. That procedural distinction does not affect our conclusion that the amendment of the name of the prior offense in case 11 CR 07223 was formal, rather than substantive.

¶ 49    Finally, we reject defendant's claim that the timing of the State's request to amend the indictment in the midst of trial misled and prejudiced the defense, such that the court's ruling was an abuse of discretion. He notes that defense counsel told the trial court that it was not aware that the State would seek the amendment. He argues that his trial counsel's "claim of surprise, and prejudice in the jury waiver decision, was thus unrebutted." However, defendant fails to describe any prejudice resulting from the amendment, with respect to his decision to waive a jury trial or the preparation of his defense. Absent any showing of prejudice from the court's decision to permit the amendment, we cannot say that the court's ruling is arbitrary, fanciful, or that no reasonable person would take the view adopted by the trial court. *Patrick*, 233 Ill. 2d at 68. That is, it was not an abuse of discretion.

¶ 50    As we conclude that the circuit court did not err in permitting the amendment to the indictment, we need not additionally discuss defendant's arguments that either prong of the plain-error doctrine applies. See *People v. Williams*, 2017 IL App (1st) 150795, ¶ 40 ("There was no error, let alone 'plain' error, and so we need not go further in the plain error analysis.").

¶ 51                                    CONCLUSION

¶ 52    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 53    Affirmed.